Bettye **YEATMAN, et al., Plaintiffs,**

v.

**INLAND PROPERTY MANAGEMENT, INC., et al., Defendants.**

No. 91 C 5101.

United States District Court, N.D. Illinois, E.D.

Feb. 25, 1994.

---

Standish E. Willis, Chicago, IL, for plaintiffs.

Dale Pierson, Baum & Sigman, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

On November 16, 1993 this Court issued a self-explanatory memorandum order in connection with the motions for summary judgment that had previously been filed under Fed.R.Civ.P. ("Rule") 56 by defendants Inland Property Management, Inc. ("Inland") and Joyce Levin ("Levin"). At that time counsel for plaintiffs Bettye and Reginald Yeatman ("Yeatmans") were delinquent in meeting the briefing schedule that counsel for all parties had established for themselves on the Inland–Levin motions, even as that schedule had later been modified to accommodate an extension requested by Yeatmans' counsel. Because that delinquency entitled this Court to proceed with its resolution of the motions, this Court had then drafted its opinion (the "Opinion") dealing with the motions.

Indeed, the Opinion was already in final form and ready for issuance when Yeatmans'

counsel belatedly served a notice that on November 19 (two weeks late!) they would move for another extension of their time to respond. Consequently this Court responded to that notice by issuing its brief November 16 opinion, granting the requested extension of time and attaching the draft Opinion to apprise the parties of this Court's then-existing perception of the case.

That sequence of events resulted in an unusual situation in which, by reason of the distribution of the draft Opinion to the litigants, Yeatmans (the parties that would have lost the case on the basis of the evidence then before this Court) knew exactly what matters this Court considered to be dispositive of the issues. It did not then exactly come as a total surprise when, nearly a month later, Yeatmans filed a response to the Rule 56 motions that sought to create material issues of fact in the critical areas that had been identified in the Opinion—issues that Yeatmans hoped would be enough to stave off summary judgment. Again not surprisingly, Inland then sought and obtained from this Court some added time to pursue additional discovery—mainly the supplemental deposition of Mrs. Yeatman on matters that had been raised in Yeatmans' responsive materials.

■ At this point the motions have become fully briefed and are ripe for decision. After full review this Court has concluded that the things that have been advanced by Yeatmans do not rise to the level of genuine issues of material fact (despite their counsel's valiant efforts to contend otherwise). For that purpose it will be remembered that a "genuine" issue does not exist unless record evidence would permit a reasonable factfinder to adopt the nonmovants' (Yeatmans') view (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)), while only facts that would prove outcome-determinative under the substantive law are "material" (*Pritchard v. Rainfair, Inc.,* 945 F.2d 185, 191 (7th Cir.1991)).

Because the Opinion had accurately reflected this Court's views based on the evidence then before it, the current discussion will proceed from the Opinion as a starting point.[1] All that is then required is to explain why the later input from Yeatmans, although it does pose some facial disputes as to facts, does not call for any change in the result.

As the Opinion shows (and as the parties agree), the key issue in this case is whether the clearly bias-exhibiting telephone call that someone made to Mrs. Yeatman (a call that included both the caller's inquiry as to Mrs. Yeatman's color and the caller's statement that Country Club Apartments in Arlington Heights "do not rent to blacks") was or was not placed by Joyce Levin. That had been the name by which the caller identified herself (though importantly for current purposes, when Mrs. Yeatman asked for her name the caller misspelled the last name "L–E–V–*E*–N"). Opinion at 631 spelled out in detail why all of the objective evidence before this Court compelled a "no" answer to the question whether the caller was really defendant Joyce Levin.

What Yeatmans' counsel have now done by way of response was triggered by this paragraph in the Opinion (at page 630):

1. Mrs. Yeatman was unable to authenticate the identity of the caller so as to render her account of the contents of the telephone conversation admissible (Fed. R.Evid. 901(a) and 901(b)(5)). She could not identify Levin's voice, and she said at her own deposition that she did not know if she would recognize the caller's voice if she heard it again.

Now Mrs. Yeatman says—although her earlier sworn testimony (Dep. 49–50) had been that she didn't know whether she could recognize the caller's voice, having had only a single brief conversation with the caller fully three years ago—that she can indeed identify Joyce Levin as the caller.

■ But although it is quite true that summary judgment motions are not the occasion for any court to weigh competing evidence (*Anderson,* 477 U.S. at 249, 106 S.Ct.

1. Accordingly a copy of the Opinion is attached to this opinion and is incorporated here by refer-ence.

at 2510), two principles negate the use of Mrs. Yeatman's currently changed testimony to defeat summary judgment:

1. Rule 56(e) limits the court's consideration of evidence to matters that would be *admissible* if this were a trial rather than a Rule 56 motion.

2. In any event, courts are not obliged to credit *everything* that a party proffers in response to a Rule 56 motion.

### *Admissibility of Mrs. Yeatman's Current Testimony*

Voice identification is a means of introducing into evidence the contents of a telephone conversation (assuming that all other requirements of admissibility are met). Both common sense and experience teach that such identification—based as it is on an aural perception obtained over the telephone wires rather than in person—is ordinarily more difficult to make, and is less reliable, than eyewitness identification. If anything, then, this opinion gives Yeatmans (as the proponents of such evidence) a considerable benefit of the doubt when it applies the accepted tests for admissibility of eyewitness identification to Mrs. Yeatman's purported telephone voice identification of Levin. Nonetheless this Court will proceed to do just that.

■ As for the admissibility of eyewitness identification, the seminal decisions remain *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) and *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Under those cases, which applied a constitutional test to determine whether evidence of that nature should be admitted or excluded, the first inquiry is whether an impermissibly suggestive procedure was used in obtaining the out-of-court identification (*Neil,* 409 U.S. at 199, 93 S.Ct. at 382). If the result of that inquiry is that the procedure has *failed* the suggestiveness test, the key inquiry then becomes whether the identification is nonetheless reliable—as *Manson,* 432 U.S. at 114, 97 S.Ct. at 2253 put it in the criminal justice context:

We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-*Stovall* confrontations. The factors to be considered are set out in *Biggers.* 409 U.S., at 199–200 [93 S.Ct., at 382]. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

■ In this instance it cannot be gainsaid that the procedure followed by Yeatmans and their counsel was highly suggestive—so much so as to be impermissible. Mrs. Yeatman knew that the sole purpose for which she was asked to listen to a very short cassette tape that contained Joyce Levin's voice was to see whether she could recognize that voice (a voice that she had heard only on a single occasion some 2–½ years earlier, and then for only a short few minutes). Only one tape containing only one female voice was played for Mrs. Yeatman. There is equally no doubt that she already knew the critical need to give an affirmative answer to the question that she was being asked. And no opportunity was given to Inland or to Levin to participate in or to monitor the procedure.

In the field of eyewitness identification, photospreads or lineups are required to be carefully assembled and neutrally presented, precisely in order to avoid the kind of situation that is posed here. What has transpired in this case is really no different from (indeed it is more egregious than) the card trick in which a magician forces on the person chosen from the audience the card that the magician intends the person to select, and then the magician purports to "divine" the card that the person has chosen. So it is that Yeatmans have clearly failed the first part of the *Neil–Manson* test.

As for the next level of inquiry, the overall question of reliability that can sometimes salvage an identification despite an impermissibly suggestive procedure, all of the circumstances here powerfully negate any degree of reliability. All that needs to be done

is to adapt to the voice identification context the factors referred to in the language that this opinion has quoted from *Manson.* There is no doubt that (even apart from to the objective factors that have already been referred to in the Opinion) Mrs. Yeatman's one-time brief exposure to the caller's voice—with such a period of years having elapsed between the time of that exposure and her later attempt at identification—must compel a determination of the identification's total unreliability as well.

Accordingly the purported current identification of Levin's voice by Mrs. Yeatman is just as inadmissible as a tainted eyewitness identification would be. And that being so, Rule 56(e) calls for this Court to decide the summary judgment motions wholly without reference to that claimed identification.

### Credibility of Mrs. Yeatman's Current Testimony

■ This opinion has already stated the familiar rule that Rule 56 motions are not the occasion for credibility determinations. But that general rule is not universally applied to all situations. For example, just three weeks ago our Court of Appeals had occasion to reconfirm the principle that a court dealing with a Rule 56 motion may grant summary judgment based on deposition testimony despite a contradictory affidavit from the same witness. As *Darnell v. Target Stores,* 16 F.3d 174, 176 (7th Cir.1994) said on that score:

> Inherently depositions carry an increased level of reliability. Depositions are adversarial in nature and provide the opportunity for direct and cross-examination.

More generally, *Anderson,* 477 U.S. at 250–52, 106 S.Ct. at 2511–12 also teaches that the Rule 56 standard is equivalent to the standard under Rule 50(a)—the Rule that covers what used to be called a motion for directed verdict and is now termed a motion for judgment as a matter of law. That standard plainly requires the parties opposing summary judgment·to place more than just a feather in the scales, but more importantly it necessarily implies some weighing of opposing evidence: as *Anderson, id.* at 251–52, 106 S.Ct. at 2512 put it:

In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

■ That at least suggests that Yeatmans' proffered evidence that unduly strains credulity cannot head off summary judgment. Even if Mrs. Yeatman's current purported identification of Joyce Levin as the years-ago caller were to be found admissible into evidence (as it is not), it would be entirely overpowered by the objective factors that this Court has referred in the Opinion (including the really unanswerable evidence (1) as to Levin's purportedly misspelling of her own name, which was carefully noted down by Mrs. Yeatman at the time of the call, and (2) as to Inland's telephone records that show *no* calls were placed to Mrs. Yeatman's number from the office where Levin was working on the day that Mrs. Yeatman received the offensive call).

This is plainly a paradigmatic case for calling into play the *Anderson* formulation that the evidence "is so one-sided that one party must prevail as a matter of law." And that being so, the entry of summary judgment against Yeatmans is entirely proper.

### Other Evidence

Yeatmans' response to the Rule 56 motion also purports to set out some other factual issues, stemming in material part from statements by Inland's disgruntled ex-employee Kathy Sawyer (who, based on all of the evidence, was herself the offending caller to Mrs. Yeatman). Given Sawyer's strong incentive to lie at this point to conceal her own culpability, there is a serious question whether any court is obligated to swallow her story (despite the general Rule 56 doctrine against making credibility determination in the summary judgment context). But that apart, the most that Sawyer's testimony could do would be to create tangential inferences—inferences that cannot stand in the face of the compelling objective evidence that conclusively negates Levin as the offending caller. Thus to the extent (if at all) that such other evi-

dentiary items might be argued to create issues of fact (something that has been answered chapter and verse by Inland's reply memorandum), none of those matters can qualify as outcome-determinative and hence as "material" in the legal sense that is required to defeat summary judgment. It is therefore unnecessary to lengthen this opinion by addressing any of those matters in detail.

### Conclusion

What was said in the draft Opinion that had been transmitted to the parties before they made their further submissions on the summary judgment motions remains true. There is no genuine issue of material fact, and both Inland and Levin are entitled to a judgment as a matter of law. This action is dismissed with prejudice.

### APPENDIX

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

BETTYE YEATMAN, et al.,

Plaintiffs,

v.

INLAND PROPERTY MANAGEMENT,

INC., et al.,

Defendants.

No. 91 C 5101

### MEMORANDUM OPINION AND ORDER

Both Inland Property Management, Inc. ("Inland") and Joyce Levin ("Levin") have moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment in this fair housing action brought against them by Bettye and Reginald Yeatman ("Yeatmans"). Although this Court has granted the extension that Yeatmans requested for filing a response to the summary judgment materials tendered by Inland,[1] Yeatmans have submitted nothing to challenge the motions. For the reasons briefly stated here, both motions are granted and this action is dismissed with prejudice.[2]

### Facts

Yeatmans have asserted, and this Court accepts as true, that on February 14, 1991 Mrs. Yeatman was specifically asked—by *someone* who had telephoned her, the caller representing herself as "Joyce Leven"— about Mrs. Yeatman's color (both Yeatmans are black) and that Mrs. Yeatman was told in the same telephone conversation that the Country Club Apartments (the "Apartments") in Arlington Heights do not rent to blacks. It is uncontradicted that Inland was then the manager of the Apartments, that Levin was then the site manager of the Apartments for Inland and that the woman who called Mrs. Yeatman did identify herself as "Joyce Leven" (sic).

That of course would not only entitle Yeatmans to go to trial on their claims but, if Levin had in fact been the offending (and offensive) caller, could even support summary judgment as to liability in Yeatmans' favor. But the fatal flaw in Yeatmans' case is that no evidence whatever supports any reasonable inference that the caller was indeed Levin:

1. Mrs. Yeatman was unable to authenticate the identity of the caller so as to render her account of the contents of the telephone conversation admissible (Fed. R.Evid. 901(a) and 901(b)(5)). She could not identify Levin's voice, and she said at her own deposition that she did not know if she would recognize the caller's voice if she heard it again.

2. Authentication objections are all too often hypertechnical rather than substantive, but in this instance the objection

---

1. Levin has simply joined in Inland's motion without providing any independent supporting materials.

2. Yeatmans' failure to respond does not authorize dismissal for that reason alone (something that would be akin to a dismissal for want of prosecution). Instead this Court must address the motions on their own merits, and it has done so in this opinion.

serves the very purpose for which authentication requirements exist. It is highly implausible that Levin would identify herself in such a conversation and would then misspell her own last name (to what end?). More importantly, there is affirmative objective evidence in the case: Telephone records covering the date of the suspect call and covering both telephones at the Inland office where Levin was then working show *no* calls to the telephone number at which Mrs. Yeatman received that call. And Levin has sworn that she had *never* called Mrs. Yeatman at any time—in fact, Levin never even knew of the Yeatmans' inquiry about an apartment until Levin was served as a defendant in this action.

3. This is not a credibility dispute, as to which Yeatmans—as the nonmovants on a Rule 56 motion—would necessarily prevail. Instead all other objective evidence also squarely supports the Inland–Levin motion, so as to negate any reasonable inference in the other direction:

(a) Mrs. Yeatman's initial telephone inquiry about the Apartments was made to the Inland office on February 11 or 12, 1991, when she spoke to "Kathy" (that was Kathy Sawyer ("Sawyer"), who then worked for Inland). That conversation resulted in Kathy (1) giving Mrs. Yeatman directions as to how to get to the Apartments and (2) setting up an appointment to show an apartment there to Mrs. Yeatman on February 17.

(b) On February 13 Inland terminated Sawyer's short-lived employment (she had been working there for only 30 days or so) for a number of job-related reasons, importantly including not only Sawyer's failure to have rented any apartments at all but also her abysmal spelling of a host of simple words—nearly approaching illiteracy (which turns out to be a critical fact in the context of this case).[3] Sawyer reacted by blaming everything on Levin (whom Sawyer characterized as hating her).

(c) It was at 9:30 a.m. the very next day—February 14—that Mrs. Yeatman received the call from the woman who identified herself as "Joyce Leven." When Mrs. Yeatman was asked the offensive race-based inquiry about her color and was told of the Apartments' asserted race-discriminatory policy, she understandably asked the caller to repeat her name. Not only did the caller do so, but she voluntarily spelled out "Leven." Mrs. Yeatman wrote the name down as it was spelled to her (in part because she herself would normally have spelled the name "Levin").[4]

### Absence of Proof

On this record there is no evidence whatever to ascribe any discriminatory actions or intentions to either Inland or Levin. It is well established that the test under Rule 56 is one of "reasonable" inferences (not every conceivable inference) in Yeatmans' favor (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991)), and the only reasonable inference here is that the telephone call was the work of the disgruntled Sawyer. Indeed, the recognized bitterness of aggrieved fired employees toward their ex-employers has led courts in fair housing cases to reject even their sworn testimony as to allegedly discriminatory policies of the ex-

---

**3.** Lest this be thought an exaggeration, here is the record-supported description in Inland Mem. 3–4:

For example, when Sawyer listed her educational history on her employment application for IPM, she wrote that her high school was located in "Phoniex [sic]" Arizona, where she studied "buisness [sic]." (Jarog Aff. ¶ 9, Ex.B) She also wrote that her husband was a "maintance [sic] man;" when she summarized her skills and qualifications, she wrote "Ive done accouting [sic] work, answer phones, bookeeping [sic], Sales, Ran a full shift (B.k) Did Invetory [sic], Sales Leger [sic], Payroll, Coumputer [sic] P.C. and IBM, worked with people" (*id.*). Similarly, after attending an IPM training seminar in part devoted to equal housing opportunity principles, Sawyer prepared an evaluation stating that the "personal goals" she set that day were "To Rent to anyone whos comes in" (*id.*, Ex.C).

**4.** During her own deposition in this case, when asked to spell Levin's name, Sawyer said (Dep. 76):

L-e-l-i—L-i-e-v—no.  L-e-i-v-e-n-e.  I don't know.

employers—see, e.g., *Young v. Parkland Village, Inc.*, 460 F.Supp. 67, 70 (D.Md.1978) ("too untrustworthy to be accorded weight"); *Stoessel v. Parkside Dev. Co.*, 358 F.Supp. 802, 804 (S.D.N.Y.1973) ("beyond the pale of credibility"). This case presents an a fortiori situation, for it involves no such question of assessing the ex-employee's credibility—which might perhaps pose a problem in a summary judgment case.

But quite apart from all of the compelling inferences that run in favor of Inland and Levin, there is simply no predicate for the drawing of *any* reasonable inference in Yeatmans' direction. And that is fatal to their lawsuit.

### Conclusion

There is no genuine issue of material fact, and both Inland and Levin are entitled to a judgment as a matter of law. This action is dismissed with prejudice.

THIS OPINION IS NOT YET ISSUED

Milton I. Shadur
Senior United States District Judge
Date: November, 1993