Peso CHAVEZ, et al., Plaintiffs,

v.

The ILLINOIS STATE POLICE, et al., Defendants.

No. 94 C 5307.

United States District Court, N.D. Illinois, Eastern Division.

Nov. 5, 1998.

---

1058

Jane M. Whicher, Harvey Michael Grossman, Imani Chiphe, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, Jonathan Klee Baum, Ted S. Helwig, Nicole Nehama Auerbach, Katten, Muchin & Zavis, Chicago, IL, for plaintiffs.

Roger Philip Flahaven, Iain D. Johnson, Illinois Atty. General's Office, Chicago, IL, for defendants.

Roger Pascal, Schiff, Hardin & Waite, Chicago, IL, William T. Barker, Sonnenschein, Nath & Rosenthal, Chicago, IL, for movant.

## MEMORANDUM OPINION AND ORDER

MANNING, District Judge.

This case centers around the plaintiffs' claim that the Illinois State Police stop, detain, and search African–American and Hispanic motorists solely on the basis of their race. Magistrate Judge Edward A. Bobrick's Report and Recommendation ("R & R") addressing the defendants' motion for

partial summary judgment (# 150–1) is before the court. The magistrate judge recommended that the defendants' motion be granted as to the equal protection claims of plaintiffs Peso Chavez and Gregory Lee, all plaintiffs' freedom of movement claims, and the claims against defendants Kenneth Hall, Lonnie Inlow, Kathleen Sauter and Michael Snyders, but denied as to Chavez' Fourth Amendment claims. He also recommended that the defendants' motion for summary judgment as to plaintiff Joseph Gomez' claims and the plaintiffs' motion to strike certain paragraphs of the defendants' Local Rule 12(m) statements (# 188–1) be denied. The plaintiffs object to all portions of the R & R adverse to them.

The following objections to additional reports and recommendations are also before the court: (1) the plaintiffs' objections regarding their motion to compel enforcement of subpoenas directed to the Office of the Secretary of State (# 216); (2) the plaintiffs' objections regarding their motion to modify discovery subpoena (# 310); (3) the plaintiffs' objections regarding their motion to file affidavits in opposition to the defendants' motion to strike and dismiss their claims for equitable relief and supplemental state law claims (# 230); (4) the plaintiffs' (# 305) and defendants' (# 307) objections regarding the defendants' motion to strike and dismiss the plaintiffs' claims for equitable relief and supplemental state law claims; (5) the plaintiffs' objections regarding their motion to certify a plaintiff class (# 324); and (6) the defendants' objections regarding the March 16, 1998 report and recommendation addressing Gregory Lee (# 345).

In addition, the following motions are also before the court: (1) the plaintiffs' motion to continue the stay with respect to the defendants' summary judgment motion (# 347–1); (2) the plaintiffs' motion to stay additional pending matters (# 355–1); and (3) the plaintiffs' motion to withdraw and substitute the declaration of Martin Shapiro and associated filings (# 367–1 and # 367–2).

The court previously accepted the magistrate judge's R & R and noted that a statement of reasons would follow. The court subsequently stayed proceedings in this case so that the plaintiffs could resolve certain issues with respect to their statistical evidence. As these matters have been resolved, the court now explains its reasoning with respect to the R & R and modifies it only insofar as it now finds that Gillette, Graham, and Cessna are entitled to qualified immunity to the extent that the plaintiffs seek to impose liability on them based on Thomas' admittedly (for summary judgment purposes) improper stop of Chavez. In addition, the court finds that Gillette and Cessna are entitled to qualified immunity based on their participation in the search of Chavez' vehicle. Thus, Gillette and Cessna's motion for summary judgment as to Chavez' Fourth Amendment stop and search claims and Graham's motion for summary judgment as to Chavez' Fourth Amendment stop claim are granted.

The court also overrules all of the objections to the magistrate judge's reports and recommendations. Finally, the court denies the plaintiffs' motion to continue the stay with respect to the defendants' summary judgment motion, the plaintiffs' motion to stay additional pending matters, and the plaintiffs' motion for leave to withdraw and substitute the declaration of Martin Shapiro and associated filings.

## I. Background

This court adopts the factual background in the magistrate judge's R & R, which was based on the parties' Local Rule 12 submissions. To briefly summarize, the plaintiffs claim, on behalf of themselves and similarly-situated individuals, that the Illinois State Police have a practice of stopping, detaining, and searching African–American and Hispanic motorists based on their race and without legally sufficient cause or justification. The plaintiffs' claims do not, however, begin with allegations of discrimination against African–American or Hispanic motorists. Instead, they arise from the stop, search, and arrest of a white motorist, George Koutsakis. *See People v. Koutsakis*, 272 Ill.App.3d 159, 208 Ill.Dec. 549, 649 N.E.2d 605 (Ill.App.3d Dist. 1995).

In November, 1992, a state trooper stopped Koutsakis for exceeding the posted speed limit on Interstate 80 by four miles.

*Id.*, 272 Ill.App.3d at 160, 208 Ill.Dec. 549, 649 N.E.2d at 606. Koutsakis denied that he was speeding. While the trooper wrote Koutsakis a warning ticket, a second trooper arrived with a drug-sniffing dog. *Id.*, 272 Ill.App.3d at 161, 208 Ill.Dec. 549, 649 N.E.2d at 607. The dog "alerted" and the police discovered 250 pounds of marijuana in the ensuing search of Koutsakis' vehicle. *Id.*

Attorney Nancy Hollander represented Koutsakis in the criminal proceedings against him. According to Hollander, when she has a client stopped with 250 pounds of marijuana, her job "is to look for miracles." Def. St. (Ex. 23) at 48–49. She suspected that state troopers were stopping motorists based on skin tone or travel patterns, and thus decided to see if she could establish that the stop of Koutsakis was pretextual. To investigate this hunch, she hired plaintiff Peso Chavez, a private investigator and New Mexico resident, to recreate the circumstances leading to Koutsakis' stop and arrest.

Accordingly, Chavez emulated the circumstances surrounding Koutsakis' stop and arrest by renting a red car with California license plates and placing open maps, fast food wrappers, a cellular phone, and a gym bag in his rental car. He then headed out to Interstate 80 for a test drive, with the full intent of being stopped. On his first day out—February 17, 1993—Chavez, followed by Katherine Austin from the Public Defenders' Office, saw state troopers on Interstate 80 three times but was not stopped.

The next morning, Chavez and Austin set out again, traveled to the western edge of Bureau County, Illinois; and began driving east on Interstate 80. State Trooper Larry Thomas was parked on the east-bound shoulder of Interstate 80 at mile post 53. When Chavez' vehicle passed him, he decided to follow it. Thomas followed Chavez for 24 miles, or almost one half hour, although he could not explain why he decided to do so. It is undisputed that Chavez traveled at no more than 60 miles per hour, although the speed limit was 65.

According to Thomas, he stopped Chavez at about mile post 77 for failing to signal a lane change. Chavez, like Koutsakis, denied that he committed any traffic violation. Attorney Austin, who was following Chavez, also denied that Chavez had committed any traffic violation. Similarly, State Trooper Dan Gillette, who was parked at a turn-around in the median at mile post 77 and was facing and monitoring eastbound traffic, observed no violation. Instead, according to Gillette, he heard Thomas' radio traffic indicating the stop before he saw Chavez' and Thomas' vehicles pass him.

Thomas and Chavez pulled over east of the area where Gillette was located, and Gillette pulled out of the turn-around and joined them. Thomas requested and received Chavez' driver's license and issued a warning ticket based on Chavez' alleged failure to signal. In his report on the incident, Thomas listed Chavez' race as "white," despite the fact that the report contained a listing for "Hispanic." Chavez, Thomas, and Gillette disagree as to the events that ensued, although everyone agrees that the entire stop took between 35 and 55 minutes.

### A. Trooper Thomas' Version

Trooper Thomas noticed that Chavez' vehicle had California license plates and a rental company registry, and that a small suitcase, discarded fast food bags, and a map were in the car. He also saw Chavez' hands shake, and thought Chavez was nervous. Thomas testified there is nothing unusual about an individual's hands shaking or nervousness during a traffic stop, or the presence of a small suitcase, fast food bags, and a map.

By the time Thomas had gone back to his car, Gillette had arrived and told Thomas he was going to talk to Chavez. While back at his car, Thomas ran a check on Chavez' driver's license and ran a criminal history, although he cannot remember the results. Thomas also ran an EPIC check on Chavez at Gillette's request.[1] Thomas does not know why Gillette wanted to talk to Chavez, or why Gillette wanted an EPIC check.

---

1. EPIC is the acronym for El Paso Intelligence Center, a collection of federal and state databases which serve as a source of information for law enforcement personnel. With respect to vehicles, EPIC contains information about border crossings.

Other portions of Thomas's testimony are inconsistent, although the inconsistencies do not rise to the level of a disputed issue of material fact. Thomas testified that, while awaiting the results of the EPIC check, he returned to Chavez' car, issued a warning ticket, and told Chavez he was free to go. He also testified, however, that he continued to talk to Chavez until the EPIC report came back, that he had received the EPIC report when he issued the warning ticket, and that he told Chavez that he was free to go, but also unsuccessfully requested permission to search Chavez' vehicle.

After Thomas issued the warning ticket, Trooper Graham arrived in a canine unit with Krott, his police dog.[2] Thomas asked Chavez if he would consent to a canine "walk-around" but did not recall Chavez' response. Thomas' field report indicates that Chavez consented. Graham then conducted a walk-around and Krott alerted, thereby indicating that drugs were in Chavez' vehicle. In response to the alert, Gillette, Graham, and Trooper Cessna, who by now had arrived on the scene, searched Chavez' car while Chavez waited in Thomas' car.[3] The officers did not find any contraband.

## B. Sergeant Gillette's Version

Gillette testified that Thomas was speaking with Chavez when he arrived at the scene. After Thomas finished his conversation, Gillette sat in Thomas' car with Thomas. Gillette said that Thomas told him there was something funny about Chavez, that he smelled air freshener in the car and that he had seen no luggage. Gillette suggested Thomas run a criminal history and an EPIC check, and Gillette then went over to Chavez' vehicle.

Gillette asked Chavez where he was going and Chavez responded that he was going to Chicago for the day. Gillette testified that, at this point, Chavez' eyes "went up into the right, which is a clear sign of deception." Gillette Dep. at 113. Gillette said that Chavez did not know what he was going to do or who he was going to see in Chicago. Gillette also said that Chavez did not know what he did for a living. Gillette thought that Chavez did not know what he did for a living because Chavez did not know what he was going to be doing in Chicago. Gillette also testified that he saw a road atlas and fast food wrappers in the car, and thought the car was too clean to have come from Albuquerque. In addition, Gillette testified both that there was no luggage in Chavez' car and that there was one piece of luggage in the car.

Gillette then returned to Thomas' vehicle. Thomas told Gillette that the criminal check was negative. In response, Gillette told Thomas that he thought something was wrong with Chavez' vehicle because there were too many "indicators."[4] Thereafter, Thomas asked Chavez for permission to search his car. Chavez refused, and the canine unit arrived. Based on the indicators, Gillette felt there was sufficient reason to detain Chavez for a canine walk-around, even though the EPIC check had not come back yet. Gillette testified Chavez did not consent to the walk-around, although Thomas' field report said that he had consented. Gillette also testified that, although Krott alerted, no drugs were found in Chavez' vehicle.

## C. Peso Chavez' Version

Chavez testified that his goal on the day of the traffic stop and search was to be pulled over. He denied, however, that he violated any traffic laws before he was pulled over.

---

**2.** The parties dispute whether Krott was properly trained and reliable. Graham, Krott's handler, testified that Krott was certified. The plaintiffs have submitted an opposing expert declaration from Steven Nicely, contending that Krott is unreliable. The defendants have moved to strike the Nicely Declaration and related portions of the plaintiffs' 12(N) statement. This motion is discussed below at § II(C).

**3.** Cessna testified that he had gone to the scene when radio traffic indicated that Chavez was suspicious. When Cessna arrived, Gillette told him the results of the EPIC inquiry and advised him that Krott had alerted to Chavez' vehicle.

**4.** According to Gillette, "indicators" are factors that suggest the presence of drugs or other criminal activity, and include: body putty or Bondo on the vehicle, missing screws, loose wiring, air freshener, no luggage, atlas on the seat, nervousness, deceptive answers, overly friendly, not knowing destination, not knowing how to get to destination or back, and criminal history.

Chavez testified that Thomas told him that he might have missed Chavez signaling his lane change. The defendants say that Thomas offered Chavez a general apology during the search.

According to Chavez, after Thomas issued the warning ticket, he did not tell Chavez that he was free to go. Instead, Chavez felt that he was not free to leave at any point during the encounter. Chavez testified that Thomas did not so much ask him to consent to a search of the vehicle, as tell him he wanted to search it. Chavez admits that he became nervous during the encounter, fearing that, if the search was unsuccessful, the troopers would become frustrated and plant evidence. He also testified that the troopers' attitude during the search was that there simply had to be drugs in Chavez' vehicle and they were going to find them. Chavez does not claim that the troopers made any racially based remarks during the encounter, and Chavez' report to Hollander included no references to race or racial motivation.

### D. Other Plaintiffs

As noted by the magistrate judge, the vast majority of evidence before the court pertains to Chavez. The plaintiffs have, however, developed some facts relating to plaintiffs Gregory Lee and Joseph Gomez. Gregory Lee, whom the court assumes is African–American, testified that he was stopped, searched, and detained three times in a single year, and that each stop was unjustified. The plaintiffs claim that during one of these stops, the state trooper referred to Lee using the phrase "you people," although there is no corroborating evidence of this in the record. The plaintiffs admit that Lee cannot identify any similarly situated white motorist who was treated differently. *See* Def. St. ¶ 237; Pl. Resp. ¶ 237.

Joseph Gomez was stopped by Illinois state troopers on March 24, 1994, and again in early 1995. He joined this case in May of 1996.

### E. Supervisory Defendants

According to the plaintiffs, defendants Kathleen Sauter, Lonnie Inlow, and Kenneth Hall supervised state trooper districts in Illinois where the plaintiffs claim violations took place. In turn, defendant Michael Snyders was involved in "Operation Valkyrie," a drug interdiction program. It is undisputed that these defendants did not personally supervise any of the troopers who allegedly violated the plaintiffs' rights. The plaintiffs also seek to hold Snyder liable for training state troopers to consider race as a factor in determining who to stop, search, and detain on Illinois highways. The defendants disagree with this characterization of Snyders' training sessions.

### F. The Statistical Evidence and the Plaintiffs' Motion to Withdraw and Substitute the Declaration of Martin Shapiro

The plaintiffs originally supported their claims with statistics and an analysis of those statistics prepared by their expert, Martin Shapiro. Shapiro based his opinion on materials prepared by Temple University's Center for Public Policy, which had analyzed the electronic data provided by the defendants to prepare it for Shapiro's analysis. Shapiro compared the percentage of whites, African–Americans and Hispanics in Illinois with the percentage of those races specified in Illinois State Police field reports. Shapiro also considered the 1990 Nationwide Personal Transportation Survey. In Shapiro's opinion, the statistics regarding the race of the population and drivers in Illinois versus the race of drivers reflected in the field reports did not correlate and the variance was too wide to occur by chance.

The plaintiffs subsequently discovered—after the objections to the R & R had been fully briefed—that Temple University's Center for Public Policy had presented Shapiro with incomplete or incorrect data. Accordingly, the plaintiffs sought to stay consideration of the defendants' motion for partial summary judgment so they could obtain a new analysis of the data. The court granted the motion to stay, reasoning that, if the statistics did not in fact support the plaintiffs' equal protection claim, that claim would not be properly before the court.

In other words, if the revised analysis correlated with the racial breakdown of Illinois drivers, the plaintiffs would almost certainly have to withdraw their equal protection claim. Given this possibility and the concomitant standing problem that would result if the statistics did not support the plaintiffs' claims, the court declined to reach the merits of one of the central issues in this case—equal protection—when the viability of that issue was so uncertain. Thus, the court stayed consideration of the objections and allowed the plaintiffs to investigate and correct its statistical evidence.

As things turned out, however, the new and revised statistics are more favorable to the plaintiffs. They thus seek to withdraw and substitute a corresponding new and revised declaration from Shapiro, as well as all corresponding portions of their response to the motion for partial summary judgment. The defendants oppose the motion, contending that the proposed substitutions will simply cause additional delay. The court need not reach the numerous arguments raised by the plaintiffs regarding the revised Shapiro declaration because, as discussed in detail below, statistical evidence cannot be used to satisfy the Equal Protection Clause's similarly situated requirement.

This means that the main utility of the revised Shapiro declaration is that it allows the court to reach the merits of the plaintiffs' equal protection claims. Of course, this is a pyrrhic victory in light of the court's ruling regarding the plaintiffs' equal protection claim. It also necessarily means that consideration of the revised analysis would not affect the court's disposition of the equal protection claims. For these reasons, the plaintiffs' motion to withdraw and substitute the revised Shapiro declaration and corresponding materials is denied.

## II. Defendants' Motion for Summary Judgment

The defendants seek summary judgment on portions of the plaintiffs' complaint, arguing that: (1) Chavez and Lee's equal protection claims must fail because Chavez and Lee have not established that they were treated differently than similarly situated white motorists; (2) summary judgment on Chavez' Fourth Amendment detention and search claims is warranted because the state troopers acted with probable cause; (3) the plaintiffs' freedom of movement claims have no constitutional basis; (4) they are entitled to qualified immunity on the plaintiffs' freedom of movement and Fourth Amendment claims; (5) summary judgment on the plaintiffs' claims against supervisory individuals is warranted as those defendants were not personally involved in the allegedly wrongful conduct; and (6) Jose Gomez' claims are barred by the statute of limitations.

The court will not repeat the well-established standards for determination of a summary judgment motion set forth in the magistrate judge's R & R, which recommended that the summary judgment motion be granted in part and denied in part. Specifically, the magistrate judge recommended that the motion for summary judgment on Peso Chavez and Gregory Lee's equal protection claims, the plaintiffs' freedom of movement claims, and the plaintiffs' claims against Kenneth Hall, Lonnie Inlow, Kathleen Sauter and Michael Snyders based on supervisory liability be granted, and that the motion for summary judgment on Chavez' Fourth Amendment claims and Joseph Gomez' claims be denied.

The plaintiffs and the defendants each have objected to portions of the R & R adverse to the respective parties. Accordingly, the court will review the portions of the R & R addressing dispositive matters to which the parties have objected de novo. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). With respect to the remaining parts of the R & R addressing dispositive matters, the court notes that a district court may review any issue presented de novo, even if no party has objected. *Delgado v. Bowen*, 782 F.2d at 82. If a timely objection is not filed, however, the court must only satisfy itself that the R & R is not clearly erroneous to accept the recommendation. *See* Fed. R.Civ.P. 72 advisory committee's note to the 1983 amendment, *citing Campbell v. U.S. Dist. Court*, 501 F.2d 196, 206 (9th Cir.), *cert. denied*, 419 U.S. 879, 95 S.Ct. 143, 42

L.Ed.2d 119 (1974); *see also Walker v. Hood,* 679 F.Supp. 372, 374 (S.D.N.Y.1988). With respect to portions of the R & R addressing nondispositive matters, the court reviews for clear error. Fed.R.Civ.P. 72(a). With these principles in mind, the court turns to the R & R and the parties' objections.

### A. Chavez and Lee's Equal Protection Claims

The magistrate judge recommended that the court grant the defendants' motion for summary judgment on Chavez and Lee's equal protection claims, based on the plaintiffs' failure to identify similarly situated white motorists who were treated differently from the plaintiffs. The magistrate judge also held that the plaintiffs' statistical evidence was insufficient to meet this burden, and that, even if it was not, the statistical evidence was flawed. The plaintiffs object, contending that the magistrate judge incorrectly required them to *prove* their claims of discrimination, and provide names of similarly situated white motorists who were not stopped in order to survive summary judgment. They also argue that their expert's analysis of statistics regarding Illinois state trooper stops is sufficient to enable them to withstand summary judgment. Finally, they argue that *U.S. v. Armstrong,* 517 U.S. 456, 465–67, 116 S.Ct. 1480, 1487, 134 L.Ed.2d 687 (1996), is inapplicable, and even if it does apply, it does not require them to show that similarly situated white motorists were treated differently than African–American and Hispanic motorists.

### 1. The Similarly Situated Requirement

■ To establish a prima facie violation of the Equal Protection Clause, the plaintiffs must show that they: (1) are members of a class; (2) who are similarly situated to members of another class; and (3) were treated differently from members of that other class. *See, e.g., McMillian v. Svetanoff,* 878 F.2d 186, 189 (7th Cir.1989). The plaintiffs must also show purposeful and intentional acts of discrimination based on their membership in a class, as opposed to discrimination on an individual basis. *Sims v. Mulcahy,* 902 F.2d 524, 538 (7th Cir.1990). In addition, they must show that the challenged conduct had a discriminatory effect and was motivated by a discriminatory purpose. *United States v. Armstrong,* 116 S.Ct. at 1487 (discussing equal protection in the context of selective prosecution); *United States v. Turner,* 104 F.3d 1180, 1184–85 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 1566, 137 L.Ed.2d 712 (1997) & —— U.S. ——, 117 S.Ct. 1722, 137 L.Ed.2d 844 (1997); *United States v. Berger,* 103 F.3d 67, 71–72 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1456, 137 L.Ed.2d 560 (1997); *United States v. Olvis,* 97 F.3d 739, 745 (4th Cir. 1996).

■ This means that, in a race case, plaintiffs must show that similarly situated individuals of a different race were not subjected to the challenged conduct. *United States v. Armstrong,* 116 S.Ct. at 1487–89; *Harris v. City of Chicago,* Nos. 96 C 3406 & 96 C 7526, 1998 WL 59873 *18 (N.D.Ill. Feb.9, 1998) (equal protection claim arising from alleged racial discrimination at the City of Chicago's Bureau of Parking); *Washington v. Vogel,* 880 F.Supp. 1542, 1544 (M.D.Fla.1995) (equal protection claim arising from allegedly race-based highway stop), *aff'd by* 106 F.3d 415 (11th Cir.1997) (unpublished table disposition). Statistical evidence showing that all defendants prosecuted during a certain year were African–American fails to satisfy this requirement. *United States v. Armstrong,* 116 S.Ct. at 1483, 1489.

The plaintiffs argue that *Armstrong* does not apply to this case because *Armstrong* is a selective prosecution case. The court disagrees. *Armstrong* is applicable because the Supreme Court specifically based its holding on equal protection principles. *Armstrong* is also particularly helpful to the court in this case because it addressed the precise arguments raised by the plaintiffs here that: (1) there is no absolute requirement that they show a failure to prosecute similarly situated individuals; and (2) statistics demonstrating that all persons subject to the allegedly wrongful conduct were of a certain race satisfy the "similarly situated" requirement.

The Supreme Court specifically rejected these arguments, and reaffirmed the requirement that an equal protection plaintiff in a

selective prosecution case identify individuals of other races that could have been prosecuted for the same offense, but were not. *Id.* at 1487, 1489. *Armstrong* also held that a study showing that all persons prosecuted were black did not meet the similarly situated requirement, explaining that the "required threshold" for equal protection claims is "a credible showing of different treatment of similarly situated persons." *Id.* at 1489.

■ The plaintiffs' arguments are based on the same flawed premise which was asserted and rejected by the Supreme Court in *Armstrong*. Thus, the plaintiffs' contention that they need not identify white motorists treated differently than the plaintiffs must fail. · *See also United States v. Turner,* 104 F.3d at 1184–85 (rejecting statistical evidence that failed to identify similarly situated individuals of races other than that of the equal protection plaintiffs, who were treated differently from the plaintiffs); *United States v. Berger,* 103 F.3d at 71–72 (same); *United States v. Olvis,* 97 F.3d at 745 (same).

In addition, the plaintiffs' attempt to distinguish *Armstrong* by arguing that a prosecutor's decision as to whom to charge is different from a state trooper's decision as to whom to stop is unavailing. Regardless of the degree of judicial deference given to either decision, the central inquiry in each case is whether any plaintiff was treated differently than a similarly situated person of a different race. The answer to this question lies not in the deference given to the decisionmaker in the respective situations, but in whether the decision(s) made resulted in impermissible treatment of similarly situated persons. Accordingly, the plaintiffs' attempt to distinguish *Armstrong* based on the fact that a state trooper, as opposed to a prosecutor, decided which motorists to stop must fail.

## 2. Evidence Regarding Similarly Situated White Motorists

### a. Peso Chavez

■ The plaintiffs have pointed to only one white motorist who is genuinely similarly situated to Chavez—George Koutsakis. Chavez was paid to recreate the circumstances surrounding Koutsakis' stop, search, and arrest as closely as possible. Chavez did this. He was then stopped and subjected to a search of his vehicle, just like Koutsakis. Simply put, the Illinois state troopers treated Chavez exactly like the white motorist emulated. Chavez' stop and search thus fails to show that he was treated any differently than a similarly situated white motorist.

■ The plaintiffs contend that attorney Katherine Austin, who was following Chavez when he was stopped but who was not stopped herself, is a similarly situated white motorist who was treated differently than Chavez. However, the record shows that Chavez is similarly situated to Koutsakis rather than Austin. Chavez and Koutsakis are both male, drove the same color cars with California license plates, had the same items visible in their cars, and denied that they violated traffic laws yet received warning tickets. In contrast, the record does not reveal any commonalities between Chavez and Austin, other than the fact that they both were driving on the same stretch of Interstate 80. This lone commonality fails to establish that Austin was similarly situated to Chavez.

To sum up, the evidence relating to Austin's alleged status as a similarly situated white motorist is insufficient as a matter of law to show that she was indeed similarly situated to Chavez and was treated differently. The court also notes that the record is devoid of any evidence regarding other specific white motorists who recreated the circumstances surrounding the stops of the allegedly mistreated minority motorists.

### b. Gregory Lee

In their objections addressing Gregory Lee's equal protection claims, the plaintiffs do not take exception to the magistrate judge's finding that Lee failed to present evidence regarding specific similarly situated white motorists who were treated differently. Instead, they focus on the alleged use of the phrase "you people" by the state trooper who stopped Lee. Specifically, Lee asserts that the state trooper who stopped him used this phrase twice:

Q: How many times has [the trooper] used the phrase "you people"?

A. When he is asking about, "you never can tell. Can I search your car" when he is asking me about do I have any contraband in the car.

Q: He says "you people"?

A: I tell him no and he says, "You never can tell with you people." I said, "No. I don't have anything. Well, you know, you never can tell with you people."

Lee Dep. at 152. The officer denied using the phrase "you people."

■ According to Lee, the police singled him out, stopped him, and searched him due to his race. His claim is thus analogous to a selective prosecution claim based on the equal protection clause. Claims of selective prosecution are judged under ordinary equal protection standards. *Armstrong*, 116 S.Ct. at 1487. To make a prima facie case for selective prosecution (*i.e.*, a violation of equal protection), the claimant must establish both that he was singled out for prosecution to the exclusion of others similarly situated, and that the allegedly selective decision to prosecute the claimant was based upon an impermissible ground. *Id.* at 1488; *Jarrett v. United States*, 822 F.2d 1438, 1443 (7th Cir. 1987).

Lee attempts to avoid this test by arguing that he did not raise a selective prosecution claim. Specifically, Lee contends that, in order to prevail on his § 1983 equal protection claim, he must show that the police "purposefully discriminated against him because of his identification with a particular (presumably historically disadvantaged) group." *Sherwin Manor Nursing Center, Inc. v. McAuliffe*, 37 F.3d 1216, 1220 (7th Cir.1994). Lee's characterization of his argument as an equal protection claim, as opposed to a selective prosecution claim, does not save the day as the same standards govern selective prosecution and equal protection claims. *Armstrong*, 116 S.Ct. at 1487. With this in mind, the court turns to an examination of Lee's claims.

■ Racist remarks alone may not give rise to an equal protection violation. *Sherwin Manor*, 37 F.3d at 1221. However, racist comments coupled with the imposition of a special burden may form the basis of an

equal protection claim. *Id. Sherwin Manor* does not specifically define what constitutes a special burden. It implies, however, that a "special burden" includes a comparative element, *i.e.*, being treated differently from someone else due to racial animus. *Id.* Thus, the *Sherwin Manor* court focused on the administrative burdens imposed on a Jewish-owned nursing home against the fact that non-Jewish nursing homes were not subjected to those burdens.

■ Lee argues that he satisfies the test set forth in *Sherwin Manor* because the stop itself was a special burden. For the purposes of discussion, the court will accept Lee's claim that the stop was due to racial animus and focus on whether Lee has established a special burden under *Sherwin Manor*. Lee's contention that the stop constituted a special burden may be literally correct, as the stop may well have burdened him (in the sense that it may have inconvenienced him). It is nevertheless legally incorrect, as he has failed to point to a similarly situated white motorist who was treated differently.

If the court accepted Lee's claim that he was stopped due to his race, it would also have to infer that he would not have been stopped if he was white. In other words, the court would have to infer that a specific similarly situated white motorist would not have been stopped. This inference would require the court to collapse the two prongs of equal protection analysis into one. Accordingly, the court finds that Lee has failed to establish the comparative element required by the equal protection clause. His argument that the stop itself satisfies *Sherwin Manor* is thus unavailing.

The court next considers whether the alleged use of the phrase "you people" alters this result. The court cannot reasonably interpret the phrase as referring to a group as it appears that Lee was alone in the car. Accepting Lee's version of what happened for purposes of this motion, the use of the phrase "you people" in connection with Lee creates an inference of racial animus. Lee's equal protection claim, however, still falters due to the second equal protection requirement—identification of specific similarly situ-

ated persons of another race who were treated differently.

Lee has not pointed to a white motorist who was treated differently. Instead, he asks the court to infer that he was treated differently from white motorists solely because the trooper who stopped him made a racist remark. The court acknowledges that Lee, unlike the police, cannot control which motorists are stopped and thus cannot control the data available to him. Nevertheless, the fact remains that Lee's claims are based solely on alleged mistreatment of him, not the dual elements of mistreatment of him and proper treatment of similarly situated white motorists. The equal protection clause includes a comparative element, but Lee has not offered any facts relating to this element. Thus, while the court in no way condones the alleged use of the phrase "you people," it concludes that Lee's equal protection claim cannot withstand summary judgment because the absence of a similarly situated white motorist is fatal to Lee's equal protection claim.

### 3. Plaintiffs' Statistical Evidence

The plaintiffs' statistical evidence in support of their equal protection argument consists of the analysis of their expert, Martin Shapiro. Regardless of which version of Shapiro's declaration the court considers, the plaintiffs' theory is the same. Specifically, the plaintiffs contend that Shapiro's analysis, which compares the percentage of whites, African–Americans and Hispanics in Illinois with the percentage of those races specified in Illinois State Police field reports and the 1990 Nationwide Personal Transportation Survey, shows that the numbers in the field reports are materially different from the numbers in the general population and the transportation survey.

As the plaintiffs put it (with respect to the first analysis), Shapiro's analysis compares "actual counts and percentages of racial groups represented in the Illinois State Police Field Reports ... to those counts and percentages which would be expected to occur if the persons reflected in the reports were treated equally." Pl. St. ¶ 51. The plaintiffs submit that the variances between

the numbers are too great to be coincidental, and argue that Shapiro's analysis shows that similarly situated persons of various races are treated differently.

■ The plaintiffs set forth numerous challenges to the magistrate judge's analysis of their statistics. The court need not specifically address these arguments or consider whether the new statistics suffer from the same infirmities as the original statistics because, as noted above, statistical evidence in equal protection cases is insufficient to show that similarly situated persons of varying races are treated differently.

### 4. Other Evidence Allegedly Showing Discrimination

The plaintiffs contend that non-statistical evidence also supports their claims of discriminatory treatment. They point to the following evidence: (1) Illinois state police permit consideration of race as a factor in deciding which motorists to stop, Pl. St. ¶ 14; Eack Dep. at 80; Zywiec Dep. at 34; (2) Illinois state troopers admit they use race as "one of the indicators" in determining whether to search a vehicle for contraband, *id.* ¶ 9; Cessna Dep. at 65, 74–76; (3) Illinois state police training manuals emphasize the alleged predominance of Hispanics as drug couriers, *id.* at ¶ 15; ISP0011806, ISP0006397, ISP0004866, ISP0004875; (4) testimony of African–American motorists recounting allegedly discriminatory law enforcement by the Illinois State Police, *id.* at ¶¶ 10–13; Sauter Dep. at 55; Peevy Dep. at 10–11, 17; Whitfield Dep. at 20, 26–27, 63–68; Acklin Dep. at 13; and (5) Illinois state police refuse to open a case when a citizen complains that he was stopped due to race, *id.* at ¶ 17; Kettlekamp Dep. at 87, 91. The plaintiffs contend that this evidence allows their claims to survive summary judgment because it demonstrates a material issue of disputed fact as to the defendants' motivation. The plaintiffs also argue that their evidence allows the court to infer that the defendants acted with discriminatory intent.

■ These arguments suffer from the same inadequacies as the arguments relating to Lee's equal protection claim. Again, even

taking the above evidence as true, plaintiffs are unable to prevail on their equal protection claim because they have failed to point to a white motorist who was treated differently. This is critical, as the Supreme Court requires the plaintiffs to show that similarly situated individuals of a different race were not subjected to the challenged conduct. *Armstrong*, 116 S.Ct. at 1487–89. As with Lee, the absence of allegations regarding the comparative element of the equal protection clause dooms the plaintiffs' equal protection claims. Accordingly, the plaintiffs' objections to this portion of the R & R are overruled, and the defendants' motion for summary judgment on the plaintiffs' equal protection claims is granted.

### B. Plaintiffs' Freedom of Movement Claims and Defendants' Corresponding Qualified Immunity Defense

▮ The magistrate judge recommended that the defendants be given the benefit of qualified immunity with respect to the plaintiffs' "freedom of movement" claims. Accordingly, he recommended that summary judgment be granted on these claims. Qualified immunity shields government officials from liability when they perform discretionary functions, unless, at the time of the alleged violation, the official's conduct violated clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To overcome a qualified immunity defense, the plaintiff must clear two separate hurdles. The plaintiff must show, first, that the right is, in fact, a clearly established right, *Apostol v. Landau*, 957 F.2d 339, 341 (7th Cir.1992), and second, that this clearly established right applies to the fact-specific situation before the court, *Auriemma v. Rice*, 910 F.2d 1449, 1457 (7th Cir.1990).

The plaintiffs stumble on both hurdles. First, they submit scant authority—two law journal cites—to support their contention that "freedom of movement," and more specifically, intrastate travel, is a clearly established constitutional right. *See* Pl. Objections at 24. The plaintiffs nevertheless maintain that intra-state travel is a "long recognized freedom ... that plaintiffs assert defendants have violated." *Id.*

▮ Recent Supreme Court authority, however, belies the plaintiffs' characterization of intrastate travel as a "long-recognized freedom." Specifically, *Bray v. Alexandria Women's Health Clinic* confirms that intrastate travel is not on a constitutional par with interstate travel: "[A] purely intrastate restriction does not implicate the right of interstate travel." 506 U.S. 263, 277, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). Plainly, plaintiffs have not demonstrated that either "freedom of movement" or "intrastate travel," phrases the plaintiffs use interchangeably, was a clearly established right at the time of the officers' alleged constitutional violation.

▮ In the interests of completeness, the court will consider the second prong of the qualified immunity analysis and will assume, *arguendo*, that the plaintiffs have established that "freedom of movement" is a clearly established constitutional right. Even with this assumption, the plaintiffs are still only halfway home, as they must establish that the alleged right is sufficiently particularized with regard to the precise facts. *Hill v. Shelander*, 992 F.2d 714, 718 (7th Cir.1993); *Auriemma v. Rice*, 910 F.2d 1449, 1457 (7th Cir.1990). To satisfy this burden, the plaintiff must cite to a closely analogous case or evidence demonstrating that the defendants' conduct is so patently violative of the particular constitutional right that reasonable officials would be aware that their conduct violated the right without guidance from the courts. *See, e.g., Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir.1993). Moreover, the unlawfulness of the action must be apparent in light of the pre-existing case law. *See, e.g., Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The plaintiffs have failed to cite to any cases involving a challenge to police conduct. Rather, plaintiffs' authority confines itself to consideration of constitutional challenges to ordinances. As the magistrate judge properly concluded, the court cannot require state troopers to keep themselves abreast of case law regarding constitutional challenges to lo-

cal ordinances, let alone apply such rulings to their daily conduct. In other words, the lack of factual correlation between the plaintiffs' cited authority and the facts in this case fail to put the officials on notice that their actions may violate a clearly established constitutional right. Accordingly, the defendants are entitled to qualified immunity because there is no clearly established constitutional right to "freedom of movement" as espoused by the plaintiffs in this case. The defendants, therefore, are entitled to summary judgment with respect to the plaintiffs' freedom of movement claims.

### C. Chavez' Fourth Amendment Detention and Search Claims, and Gillette, Graham, and Cessna's Corresponding Qualified Immunity Defense

#### 1. The Fourth Amendment Claims

The defendants have not objected to the magistrate judge's recommendation that their motion for summary judgment should be denied as to Chavez' Fourth Amendment claims. The defendants have conceded for summary judgment purposes that Thomas' stop of Chavez was unlawful as Chavez had not committed a traffic violation. Def. Memorandum of Law at 4.[5] After a vehicle is stopped, what occurs next must be reasonably related to the circumstances that justified the stop in the first instance. See, e.g., Valance v. Wisel, 110 F.3d 1269, 1276 (7th Cir.1997).

■■■ As noted above, the defendants have conceded for the purposes of this motion that no traffic offense occurred. Thus, the stop and the ensuing search were both unreasonable, as the search could not be reasonably related to the circumstances justifying the stop because the stop was unjustified from its inception. Moreover, the fact that Gillette, Graham, and Cessna were not involved in the decision to stop Chavez does not insulate them from liability as officers may treat information given by other officers as presumptively correct. If it turns out the

information is incorrect, however, the officers may be liable regardless of what they believed. *Ruehman v. Sheahan*, 34 F.3d 525, 527 (7th Cir.1994), *citing Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *cf. Gramenos v. Jewel Cos., Inc.*, 797 F.2d at 439 ("[p]robable cause does not depend on the witness turning out to have been right, it's what the police know, not whether they know the truth, that matters").

#### 2. Qualified Immunity—Gillette, Graham, and Cessna

The officers' apparent violation of Chavez' Fourth Amendment rights, based on their admission for purposes of this motion that Chavez did not commit a traffic violation, does not end the court's inquiry. Specifically, Gillette, Graham, and Cessna are still entitled to summary judgment if they can demonstrate that they are protected by qualified immunity. In their objections, Gillette, Graham, and Cessna argue that they had a right to rely on the information provided to them by Thomas. Although they do not specify what information Thomas provided to each officer, the essence of their position is that they were entitled to rely on a presumption that Thomas' stop of Chavez was justified.

The magistrate judge recommended denial of all of the defendants' qualified immunity claims relating to Chavez, reasoning that Chavez had a clearly established right to be free of an unreasonable search. He also noted that it was clearly established that the police officers need probable cause to stop and detain a motorist and search for narcotics. He then concluded that, because Thomas' stop of Chavez was unreasonable from its inception, all of the officers subsequently involved in the stop were precluded from asserting a qualified immunity defense.

■■■ Government "officials performing discretionary functions generally are shielded from liability for civil damages unless their

5. The court notes that Thomas' stop of Chavez' vehicle would have been reasonable if Thomas had probable cause to believe that Chavez had committed a traffic violation, even if his real

reason for the stop was a hunch that Chavez was involved in drug trafficking. *See Whren v. U.S.*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Khuans v. School District 110*, 123 F.3d 1010, 1013 (7th Cir.1997), *citing Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. 2727. "A right is clearly established when its contours are sufficiently clear so that a reasonable official would realize that what he is doing violates that right." *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir.1997). Qualified immunity is available if the official could reasonably have believed that his or her actions were lawful, even if the official ultimately turns out to have been mistaken. *Anderson v. Creighton*, 483 U.S. at 641, 107 S.Ct. 3034.

### a. The Stop

As noted above, Gillette, Graham, and Cessna argue that they relied on unspecified information provided by Thomas as to the rationale for the stop and thus are entitled to qualified immunity, citing to *Eversole v. Steele*, 59 F.3d 710 (7th Cir.1995); *United States v. Patterson*, 65 F.3d 68 (7th Cir.1995), *cert. denied*, 516 U.S. 1061, 116 S.Ct. 740, 133 L.Ed.2d 689 (1996); *Gordon v. Degelmann*, 29 F.3d 295 (7th Cir.1994); *Gramenos v. Jewel Companies*, 797 F.2d 432 (7th Cir. 1986); *Spiegel v. Chicago*, 920 F.Supp. 891 (N.D.Ill.1996); *Irvin v. Kaczmaryn*, 913 F.Supp. 1190 (N.D.Ill.1996); *Bibart v. Stachowiak*, 888 F.Supp. 864 (N.D.Ill.1995), and cases from other jurisdictions.

 The court parts company with the magistrate judge as it does not agree that the facts in this case do not support a finding of qualified immunity with respect to Gillette, Graham, and Cessna to the extent that the plaintiffs seek to impose liability based on Thomas' stop of Chavez. The key inquiry with respect to qualified immunity is whether a reasonable officer could have believed that probable cause existed in light of clearly established law and the information possessed by the officer. *Anderson v. Creighton*, 483 U.S. at 641, 107 S.Ct. 3034. To evaluate the officers' qualified immunity claim, the court must examine their "specific knowledge of the facts from the perspective of a reasonable officer." *Spiegel v. City of Chicago*, 920 F.Supp. 891, 896 (N.D.Ill.1996).

 Here, the only specific fact known by the officers is that another officer had previously stopped Chavez. Police officers are entitled to rely on information provided by other officers. *U.S. v. Hensley*, 469 U.S. 221, 232, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Irvin v. Kaczmaryn*, 913 F.Supp. at 1199. This begs the question: did Thomas actually provide any information to Gillette, Graham, or Cessna? The defendants do not point to any specific information provided by Thomas, other than the fact that the officers knew that Thomas had previously stopped Chavez. Despite the plaintiffs' arguments, Gillette, Graham, and Cessna were entitled to rely on the presumption that Thomas had stopped Chavez based on an actual traffic violation. *Gramenos v. Jewel Cos. Inc.*, 797 F.2d at 439 (police officer has probable cause if the officer's actions are based on information from a person who reasonably appears to be truthful); *Irvin v. Kaczmaryn*, 913 F.Supp. at 1199 (officers who did not participate in seizure were entitled to qualified immunity regardless of lack of probable cause where the arresting officer told them that the seized individuals had been in his police car); *O'Leary v. Luongo*, 692 F.Supp. 893, 902 (N.D.Ill.1988) (a police officer is entitled to rely on information provided by another police officer).

 This means that Gillette, Graham, and Cessna are entitled to qualified immunity to the extent that the plaintiffs seek to impose liability on them based on Thomas' admittedly (for summary judgment purposes) improper stop of Chavez. With this in mind, the court turns to the next issue—whether Gillette, Graham, and Cessna's conduct at the scene was reasonably related to their presumption regarding the existence of a valid justification for the stop in the first instance.

### b. The Search

 A vehicle may be searched without a warrant if there is probable cause to believe that the car contains contraband. *United States v. Patterson*, 65 F.3d 68, 69 (7th Cir. 1995), *citing Carroll v. United States*, 267 U.S. 132, 153–56, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Chavez observes that he was not, in

fact, concealing drugs in his car, and contests the qualifications of the canine who alerted to his vehicle. Nevertheless, it is uncontested that Gillette identified indicators that suggested drug activity. These indicators included California license plates, open maps, fast food wrappers, and air freshener. Indeed, Chavez admits that he intentionally emulated Koutsakis, a known drug courier, and that he was nervous during his encounter with the police. The search was also based, at least in part, on the fact that Krott, the canine handled by Graham, alerted, thereby indicating (albeit erroneously) the presence of drugs in Chavez' vehicle.

### i. Gillette and Cessna

It is unclear how long Chavez was detained prior to the arrival of Graham and Krott, his canine. The range of time suggested by the parties is no less than 35 minutes and no more than 55 minutes. Working from the premise that Gillette, Graham, and Cessna were entitled to believe that Thomas had properly stopped Chavez, the court is unwilling to conclude that Gillette and Cessna's search and their conduct during that search violated any clearly established constitutional right, as they were entitled to rely on the assumption that the stop was valid. In addition, it was not unreasonable for these officers to rely on Krott's alert as the basis for their ultimately fruitless search of Chavez' vehicle as they could not be expected to know of the issues relating to Krott's reliability. *See United States v. Patterson*, 65 F.3d at 71 (the alert of a canine provides probable cause). This is especially true for Cessna, who arrived on the scene after Krott had alerted.

Accordingly, the undisputed facts demonstrate that Gillette and Cessna could reasonably have believed that their actions with respect to Chavez were lawful. Thus, they are entitled to qualified immunity, even though the underlying basis of the stop— Thomas' viewing of a traffic violation by Cha-

vez—concededly did not occur. The court thus declines to accept the magistrate judge's R & R as to Gillette and Cessna's qualified immunity defense. Instead, the court finds that Gillette and Cessna are entitled to summary judgment on Chavez' Fourth Amendment claims based on qualified immunity.

### ii. Graham and Krott

The plaintiffs' attempt to create a fact issue as to Krott's reliability via the declaration of Steven Nicely means that the court must consider Graham's request for qualified immunity separately as Graham, unlike his fellow officers, could be expected to know of any alleged problems with respect to Krott.[6] The defendants seek to strike Nicely's declaration, which attacks Krott's training and qualifications, pursuant to Fed.R.Civ.P. 26(a), 26(e), and 36. Alternatively, they contend that the declaration should be stricken because Nicely has never seen or examined Krott.

The deadline for disclosure of plaintiffs' experts was October 1, 1998. Stepping back in time, the defendants point out that the plaintiffs's response to their first set of discovery stated that they had no experts. In October of 1996, plaintiffs' counsel, in response to the court's observation that it did "not think that it is necessary to get into expert discovery at this time," stated "I didn't say that it was." After several extensions of time to file their response to the summary judgment motion, in response to defendants' concerns regarding the possible use of expert testimony, the court stated that the proper remedy for opinion testimony proffered by the plaintiffs would be a motion to strike. The plaintiffs submitted expert declarations and thus disclosed their experts for the first time in their response to the defendants' summary judgment motion. Four days later, without leave of court, the plaintiffs filed supplemental responses to the defendants' eighth and ninth requests to admit which changed their prior responses.

---

**6.** The court notes that it is assuming that Graham would reasonably have known about the alleged problems with Krott as this appears to be consistent with the facts adduced on summary judgment. The parties, however, have not addressed this issue. Although the court is loathe

to suggest that any party file an additional motion regarding Krott in light of the procedural posture of this case, the court will nevertheless observe that the defendants may file an appropriate motion if they believe that this assumption is not warranted.

 The conduct of plaintiffs' counsel with respect to the initial disclosure of their experts leaves much to be desired and has not facilitated the disposition of the defendants' motion for partial summary judgment. Nevertheless, in light of the fact that the court expressly set dates for expert discovery which post-date the summary judgment filings, the court, in its discretion, declines to strike the declarations submitted by the plaintiffs based on 26(a), 26(e), and 36. The court also declines to strike the Nicely declaration based on the fact that Nicely reviewed documentation regarding Krott, as opposed to Krott himself, as this does not mean that Nicely is necessarily unqualified.

 This leaves the court with conflicting evidence regarding Krott's reliability. As noted above, it is reasonable to conclude that Graham would be aware of Krott's reliability, or his alleged lack thereof. The factual dispute regarding his reliability prevents the court from resolving Graham's claim for qualified immunity at this time. Specifically, if the plaintiffs ultimately convince the trier of fact that their expert is right and Krott is clearly unreliable, Graham's' actions predicated on Krott's alert would violate Chavez' clearly established constitutional rights.

On the other hand, if Krott is ultimately vindicated, Graham will be entitled to qualified immunity; denial of his request for qualified immunity at this juncture is not dispositive. *See Chan v. Wodnicki,* 67 F.3d 137, 139 (7th Cir.1995) (qualified immunity is immunity from both trial and judgment). For these reasons, the court agrees with the magistrate judge, albeit for different reasons, that Graham is not entitled to qualified immunity with respect to Chavez' Fourth Amendment claims.

### D. Plaintiffs' Claims Against Supervisory Individuals

Hall, Sauter, Inlow, and Snyders seek summary judgment on the claims against them.[7] The magistrate judge recommended

that the motions for summary judgment be granted, reasoning that it is undisputed that Hall, Sauter, Inlow, and Snyders did not supervise any of the state troopers who allegedly violated plaintiffs' rights. The magistrate judge also noted that the plaintiffs' claims against Hall, Sauter, and Inlow based on statistical evidence allegedly showing discrimination in the district commander's respective districts were unconvincing. Finally, he rejected the plaintiffs' argument that Snyders is liable because he allegedly failed to train state troopers not to consider race as an indicator of illegal drug activity. The plaintiffs object to the recommendation regarding Snyders, but do not challenge the recommendation regarding Hall, Sauter, and Inlow.

### 1. Snyders

With respect to Snyders, the plaintiffs contend that disputed issues of material fact exist. Specifically, the plaintiffs assert that there are factual questions regarding whether Snyders supervised the officers who allegedly discriminated against them, and whether Snyders taught troopers to consider race in the Operation Valkyrie program, or facilitated or condoned racially discriminatory enforcement. In support of their claim that Snyders supervised the troopers involved in this case, plaintiffs point to their 12(n) statement and Snyders' deposition. *See* Plaintiffs' 12(n) at ¶ 246; Snyders Dep. (Ex. 25) at 59.

 The plaintiffs also claim that the magistrate judge improperly failed to give them the benefit of inferences in their favor, pointing to the fact that Snyders cautioned troopers in a training session that if they "waited for Mexicans driving pick-ups, they'd miss all the white guys with the dope." ISP00011806. According to the plaintiffs, this statement means that the troopers should presume that Mexicans carry dope and that "white guys" may also carry dope. This is a tortured interpretation of the comment; the plain import of the comment is

that troopers should *not* look to race as the sole indicator of who carries drugs, because if they *do so*, they will not stop the "white guys" who are actually transporting drugs. The court thus declines the plaintiffs' invitation to semantically stretch Snyders' statement to transform it into something diametrically opposed to its plain meaning.

■ Second, the plaintiffs argue that there is a disputed issue of material fact as to whether Snyders taught state troopers to use race as an indicator. Snyders denies that he did, and states there is no reason to do so. Snyder Dep. (Ex. 25) at 141–42. The plaintiffs, however, contend that Snyders did teach Cessna to use race as a factor, and cite to Cessna's testimony in support, arguing that it creates an inference that Snyders taught Cessna to use race as an indicator. The court disagrees.

Cessna testified:

Q: Who were your Valkyrie instructors at the training program?

A: The original training program?

Q: Yes.

A: Mike Snyders, I believe Tom Alvaro.

\* \* \* \* \* \*

Q: How about the race of the driver, is that an indicator?

A: You have to keep it in mind, yes.

Q: What do you keep in mind about the race of the driver?

A: Just use it as one of many indicators to—you've got to keep it in mind when talking to the subject.

Q: So how would—give me a scenario where the race of the driver would factor into the equation.

A: I can't give anything like that. I don't know what you mean.

Q: How about a young black male in a very expensive BMW, new BMW, would that be a factor?

A: It depends if any—some of the other indicators ... It *can* be an indicator I suppose.

\* \* \* \* \* \*

Q: What about the race of the driver, would that be a factor that you would consider?

A: Maybe ... I'm not saying you see one thing and decide to stop them. If there is a bunch of different things together—

\* \* \* \* \* \*

Q: Well, would it—could it possibly make a difference if it was, let's say, a Caucasian versus a black male?

\* \* \* \* \* \*

A: I don't know. It would just be—it just depends on the situation what you do at the time.

\* \* \* \* \* \*

Q: Have you been given any instructions by the Illinois State Police regarding how to decide which cars to stop and not to stop?

A: No ... It's all discretionary.

Cessna Dep. at 58, 65–66, 74–78.

Construing Cessna's testimony in the light most favorable to the plaintiffs, this shows that Snyders participated in Cessna's original training and that Cessna considers race in some way in the course of his work. However, the required nexus between these two facts—evidence showing that Snyders taught Cessna to use race as a factor—is missing. Put another way, the independent facts that Snyders and Alvaro taught Cessna and that Cessna testified that race may play a role in his decisions does not, without more, create a factual question as to whether Snyders taught Cessna to use race as a factor in Valkyrie stops.

This conclusion is further supported by Snyders' testimony that training programs are meant to prevent troopers from allowing race-based beliefs to affect their decisions in the workplace. Snyders Dep. at 59. The fact that a student allegedly discriminates after being taught not to do so does not necessarily mean, without more, that the student's former teacher taught the student to discriminate. When the only connection between the student and the teacher is the student-teacher relationship itself, it is just as likely that the student's actions are based on some other source. Actual facts, not

hypotheticals, are sufficient to create a factual question. With respect to the plaintiffs' theories regarding Snyders, the plaintiffs have failed to satisfy this standard.

Similarly, the plaintiffs' assertion that Snyders conducted "extensive monitoring" of state troopers, (Plaintiff. St. Disputed Facts ¶ 246; Pl. St. Add. Facts ¶ 16), does not necessitate an inference that Snyders therefore supervised Cessna. The evidence regarding Snyders' monitoring shows that he conducted training sessions in an on-going effort to, among other things, dissuade troopers from using race as a factor when making stops. See Snyders Dep. at 59. In addition, the court notes that the plaintiffs have not cited to any authority supporting the proposition that training is synonymous with supervision. The court thus declines to find that training officers transforms the trainer into a de facto supervisor of all of his or her students.

The plaintiffs' final evidence regarding Snyders' alleged training of Cessna to use race as a factor is based on their interpretation of Snyders' training materials. See ISP0011806. According to the plaintiffs, Snyders, in a training session, used an example of a trooper who pulled over a vehicle with Wisconsin license plates driven by a "Mexican" because he suspected that it was an escort vehicle for a suspected drug courier vehicle with Wisconsin license plates also driven by a "Mexican." The plaintiffs appear to be arguing that this evidence creates a factual question as to whether Snyders taught state troopers to pull over cars with Latino drivers based on the presumption that Latinos transport drugs.

Interpreting any contextual ambiguity in favor of the plaintiffs, the example nonetheless fails to create a material factual question. An example is nothing more than a case-study, a sample situation which must necessarily include a "made-up" illustrative element. The fact that the "made-up" element for this particular example was "Mexican" drivers does not create an inference that Snyders was teaching Illinois police that Latino drivers are more likely to be transporting drugs. At best, the use of the word "Mexican" demonstrates a lamentable lack of

sensitivity. This lack of sensitivity in one illustration among undoubtedly many, however, does not provide any indicia suggestive of race-motivated training techniques. In other words, the fact that Snyders' fact pattern featured Latino drivers does not implicitly tell Illinois police that all Latino drivers are drug couriers and should thus be stopped.

To sum up, the plaintiffs have failed to point to any evidence linking Snyders' training to Cessna's use of race, and have failed to create a question of material fact as to whether Snyders taught state troopers to use race as a factor in their work, or facilitated or condoned racially discriminatory enforcement. Accordingly, the plaintiffs' objections to the magistrate judge's recommendation are overruled.

### 2. Hall, Sauter, and Inlow

With respect to Hall, Sauter, and Inlow, the plaintiffs' argument that there is a genuine dispute as to whether these defendants are liable for their supervision of troopers in their districts because the plaintiffs' statistics demonstrate discrimination is unconvincing. Even assuming that the plaintiffs' statistics are valid, there must be an affirmative causal link between the supervisor and the alleged constitutional injury. *Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Jones v. Chicago,* 787 F.2d 200, 203 (7th Cir.1986). In addition, no supervisory liability exists under § 1983 in the absence of allegations that the supervisors knew about the allegedly unconstitutional conduct and the basis for it, and then approved of it. *See, e.g., Gossmeyer v. McDonald,* 128 F.3d at 495.

Allegations that supervisory defendants were bound to know about purported discrimination based on the type of statistics provided by the plaintiffs are not synonymous with allegations that the supervisors actually knew about and approved of the allegedly wrongful conduct. The plaintiffs have failed to establish this type of causal link. In addition, they have failed to point to evidence showing that Hall, Sauter, or Inlow knew of the allegedly unconstitutional conduct and approved of it. Accordingly, the

court accepts the magistrate judge's recommendation and grants summary judgment in favor of Hall, Sauter, and Inlow.

### E. Joseph Gomez' Claims—Statute of Limitations

The defendants seek summary judgment on Joseph Gomez's claims based on his March 21, 1994 stop, pointing to Illinois' two-year statute of limitations. *See, e.g., Booker v. Ward,* 94 F.3d 1052, 1056 (7th Cir.1996) (applying two-year Illinois statute of limitations period to a § 1983 case arising in Illinois), *cert. denied,* —— U.S. ——, 117 S.Ct. 952, 136 L.Ed.2d 840 (1997). The defendants object to the magistrate judge's R & R recommending denial of this motion, contending that summary judgment as to the March 21, 1994 stop is warranted because:. (1) the statue of limitations had run; and (2) Gomez is not entitled to Illinois' equitable tolling rule because he slept on his rights and is abusing the tolling rule. The plaintiffs, on the other hand, argue that equitable tolling applies to Gomez' claim because this is a class action.

■ The alleged discrimination against Gomez occurred on March 21, 1994. Gomez complained to the Illinois state police the next day. Gomez subsequently filed suit in May of 1996, two months after the two-year statute of limitations had run. Thus, the defendants are entitled to summary judgment unless Gomez can take advantage of Illinois' equitable tolling rule. *Chardon v. Fumero Soto,* 462 U.S. 650, 662, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983) (in § 1983 cases, the statute of limitations and tolling provisions from the state in which the claim arose are applicable).

■ In Illinois, the filing of a class action tolls the statute of limitations as to all asserted class members who would have been parties if the case were to proceed as a class action. *Regnery v. Meyers,* 287 Ill. App.3d 354, 366, 223 Ill.Dec. 130, 679 N.E.2d 74, 81 (Ill.App.1st Dist.1997). The doctrine of equitable tolling, however, does not protect purported class members who have slept on their rights. *Id., citing American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 554–55, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). Moreover, when determining whether equita-

ble tolling applies, courts must balance the interests served by the tolling provision against the possibility of abuse. *Id.*

The defendants submit that the magistrate judge balanced these interests incorrectly, and contend that Gomez slept on his rights and is attempting to abuse the tolling rule. Specifically, they point to Gomez's testimony that he contacted the ACLU the day after the March 21, 1994 stop, but did not retain them because he was consulting with another attorney. *See* Gomez Dep. at 9–10; Fourth Amended Complaint at ¶ 107. The defendants also argue that Gomez has abused the tolling rule because he knew of and complained about the purported discrimination and consulted an attorney, but only entered this suit as a named plaintiff when the ACLU contacted him and offered to represent him for free.

■ The court agrees with the magistrate judge that Gomez' interests in pursuing this suit outweigh the potential for abuse. First, the policies underlying the tolling doctrine favor tolling when a named plaintiff "commences a suit and thereby notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs ...." *American Pipe,* 414 U.S. at 555–56, 94 S.Ct. 756. This allows the defendants to determine the subject matter and size of the prospective litigation within the limitations period. *Id.*

Second, the addition of Gomez' claims arising from the March 21, 1994 stop will not prejudice the defendants. As the magistrate judge correctly noted, the defendants were aware of the potential plaintiffs through the class action and had notice of Gomez as a potential plaintiff through his complaint to the Illinois state police. Third, although Gomez did not join the suit at its inception, the evidence shows that he promptly complained to the Illinois state police, investigated his legal options in several ways, and joined this case when he learned it existed.

Thus, the interests of justice and equity favor application of the tolling rule, and Gomez is entitled to take advantage of it with respect to his claims based on his March 21,

1994 stop. For these reasons, the defendants' motion for partial summary judgment with respect to Gomez based on the statute of limitations is denied.

### F. Lee's Claims Against Lauterbach and Fraher

On March 16, 1998, the magistrate judge recommended that the defendants' motion for summary judgment as to defendants Robert Lauterbach and Dale Fraher, who are both Illinois state troopers, be denied. The gravamen of the defendants' position regarding Lauterbach and Fraher is that Lee's identifications of them are inherently unreliable. According to the defendants, the patent untrustworthiness of the identifications entitles them to summary judgment.

The court adopts the magistrate judge's summary of the relevant facts. In short, Lee claims that Lauterbach stopped him in March of 1993 and Fraher stopped him in August of 1993. Lauterbach and Lee each attempt to cast doubt on Lee's identifications of them by pointing to factual discrepancies, such as the absence of records documenting the alleged stops, the scope of their patrol areas, their physical descriptions, the characteristics of their uniforms, and the passage of time between the alleged stops and Lee's identifications. Fraher also points out that Lee did not see or hear a canine during Fraher's alleged stop of Lee, despite the fact that Zeus, a large, extremely active German Shepard who barks constantly when people or moving vehicles are near him, was on patrol with Fraher throughout 1993.

The magistrate judge found that the defendants' motion turned on a determination as to the credibility of Lee, Lauterbach, and Fraher. He also noted that Lauterbach and Fraher had failed to produce evidence definitively establishing that they were not present when Lee was stopped. In addition, he observed that Lauterbach and Fraher claimed that they did not recall stopping, detaining or searching Lee, not that they had not done so. Thus, he concluded that factual questions precluded the entry of summary judgment with respect to Lauterbach and Fraher.

The defendants contend that there is no genuine issue of material fact because "it is plain that the plaintiff has no case that could persuade a reasonable jury." *See* Defendants' Objections to the March 16, 1998 R & R at 9. Specifically, the defendants argue that: (1) the court should reject Lee's testimony because it is so internally inconsistent and implausible that a reasonable fact finder would not credit it; (2) the magistrate judge improperly failed to address authority cited by them; and (3) the magistrate judge improperly failed to address the admissibility of the defendants' expert in the field of eyewitness identification. Because the recommendation addresses a dispositive motion, the court will consider these matters de novo.

A "genuine" issue of fact exists only if record evidence would permit a reasonable factfinder to adopt the nonmovants' view. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Unterreiner v. Volkswagen of America, Inc.,* 8 F.3d 1206, 1212 (7th Cir.1993) (summary judgment may be proper where evidence in opposition is merely colorable, or not sufficiently probative). Thus, evidence "that unduly strains credulity cannot head off summary judgment." *Yeatman v. Inland Property Management, Inc.,* 845 F.Supp. 625, 629 (N.D.Ill.1994). With these standards in mind, the court turns to the defendants' arguments.

The court agrees with the defendants that the following factors are relevant when evaluating the reliability of eye witness identifications: (1) the opportunity of the witness to view the defendant at the time of the incident; (2) the witness' degree of attention at that time; (3) the accuracy of his prior description of the defendant; (4) the level of certainty demonstrated with respect to the subsequent identification; and (5) the time between the incident and the subsequent identification. *Id.* at 628, *citing Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (addressing identification in a criminal case). The court disagrees with the defendants, however, as to whether these factors justify granting Lauterman and Fraher's motion for summary judgment.

Simply put, while Lee has unquestionably not come forward with a smoking gun, the court cannot conclude that his evidence is so weak that the defendants must prevail as a matter of law. *Cf. id.* at 629 (defendants were entitled to summary judgment where evidence was so one-sided that they were entitled to prevail as a matter of law). The court also declines to find that no reasonable person would believe Lee's testimony. *Cf. Seshadri v. Kasraian,* 130 F.3d 798, 802 (7th Cir.1997). Again, while Lee's evidence may not be 100% conclusive, a reasonable fact finder could believe him and disbelieve Lauterman and Fraher.

In addition, the court rejects the defendants' argument that Lee's evidence is inherently unreasonable and thus is insufficient to stave off summary judgment. *See* Defendants' Objections to the March 16, 1998 R & R at 13–14, *citing* 11 *Moore's Federal Practice* ¶ 56.11[3] at 56–99—56–100 (3d ed.1997). The court acknowledges the fact that the defendants have pointed to evidence which, if accepted by the finder of fact, would exonerate Lauterman and Fraher. As before, however, the court nevertheless finds that it is entirely possible that a jury could side with Lee. The court also notes that Lee's testimony, if believed, would be outcome determinative, and thus is indisputably "material." *See Yeatman v. Inland Property Management, Inc.,* 845 F.Supp. at 627.

Thus, the court agrees with the magistrate judge that the Lauterman and Fraher identifications come down to a question of credibility, and do not entitle Lauterman and Fraher to summary judgment. The defendants' proffered expert testimony regarding the alleged unreliability of eye witness testimony does not alter this conclusion as it affects the weight, not the admissibility, of Lee's testimony. In addition, as noted above, the court has already found that Lee's testimony creates a genuine question of material fact and thus is sufficient to withstand summary judgment. For these reasons, the defendants' objections with respect to Lauterbach and Fraher are overruled and Lauterbach and Fraher's motion for summary judgment is denied.

## III. Defendants' Motion to Strike Plaintiffs' Claims for Equitable Relief and to Dismiss Plaintiffs' State Law Claims

The magistrate judge recommended that the defendants' motion to strike plaintiffs' claims for equitable relief be granted and that the defendants' motion to dismiss plaintiffs' state law claims be denied. Both sides have objected to the portions of the R & R which are adverse to them. Specifically, the plaintiffs claim that the magistrate judge based his recommendation with respect to the claims for equitable relief on an incorrect assumption that his recommendation on the defendants' motion for partial summary judgment, if sustained, would require this result. With respect to the recommendation regarding their motion to dismiss the plaintiffs' state law claims, the defendants contend that this court lacks jurisdiction and that the Illinois Court of Claims is the only court that may properly adjudicate these claims.

### A. Defendants' Motion to Strike Plaintiffs' Claims for Equitable Relief

On February 9, 1996, the court granted the defendants' motion to dismiss the plaintiffs' claims for equitable relief pursuant to Fed. R. Civ. 12(b)(6), based on lack of standing. Two amendments of the complaint later, the defendants moved to strike the plaintiffs' claims for equitable relief, the magistrate judge agreed that this was warranted, and the plaintiffs objected to that portion of the R & R.

The plaintiffs seek an injunction against the defendants' alleged practice of stopping, detaining, and searching motorists based on race. The magistrate judge recommended dismissal of this request for injunctive relief, due to his recommendation with respect to the defendants' motion for partial summary judgment. The plaintiffs object, arguing that the magistrate judge's recommendation regarding equitable relief was based on an erroneous belief that a recommendation of partial summary judgment was enough to doom the claims for injunctive relief. According to the plaintiffs, the remaining pending claims form an adequate basis for their request for injunctive relief. The plaintiffs

thus conclude that dismissal of the request for injunctive relief is incorrect. The plaintiffs also object to the magistrate judge's ruling denying their motion for leave to submit additional authority with respect to their motion.

██ The plaintiffs indeed have several claims pending as the defendants have only obtained partial summary judgment. The critical fact, however, is that the claim which forms the basis of the plaintiffs' request for class certification—equal protection—is not viable for the reasons discussed above. The question thus is whether the plaintiffs' pending claims can support their request for equitable relief. The answer to this question is "no," as the plaintiffs lack standing to obtain an injunction on their own behalf and the absence of an order certifying a class means that injunctive relief on behalf of the putative class would be improper.[8]

### 1. Standing—Injunctive Relief on Behalf of the Named Plaintiffs

The court agrees with the magistrate judge's conclusion that the court may properly consider matters outside the complaint when determining whether standing exists. The plaintiffs' standing to pursue their equitable claims, however, has not changed since the court's February 9, 1996 order denying the plaintiffs' motion for equitable relief (with the exception of the fact that the Thomases are no longer part of this suit). *See Chavez v. Illinois State Police*, No. 94 C 5307, 1996 WL 66136 (N.D.Ill. Feb.13, 1996).[9]

██ As the court previously noted, *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), mandates that: "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as a result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural or hypothetical.' " *Id.*, at 101–02, 103 S.Ct. 1660. Past

"exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.* at 101, 103 S.Ct. 1660. Moreover, past wrongs do not necessarily add up to the "real and immediate threat of future injury" necessary to satisfy the case or controversy requirement of Article III. *See id.* at 107, 103 S.Ct. 1660.

██ Before the court considers whether the plaintiffs have standing to pursue their request for equitable relief, it must determine what materials are properly before the court. The court concludes, in its discretion, that the parties' submissions do not, and will not, include any additional materials, as requested in the plaintiffs' objections to the magistrate judge's order denying the plaintiffs' leave to file affidavits in opposition to the defendants' motion to strike the plaintiffs' state law claims. This is because the court believes that the magistrate judge's order addressing this nondispositive motion was eminently reasonable in light of the procedural posture of this case, the timing of the plaintiffs' request, and the impact of the motion on the defendants. Accordingly, the plaintiffs' objections to the magistrate judge's order addressing the plaintiffs' motion for leave to file additional affidavits are overrruled.

██ With this in mind, the court turns to the motion to dismiss the plaintiffs' equitable claims. After careful consideration of the parties' submissions, the court concludes that the plaintiffs have failed to establish that injunctive relief based on the individual plaintiffs' claims is proper. *See Chavez v. Illinois State Police*, 1996 WL 66136 at *4–6, *citing Daniels v. Southfort*, 6 F.3d 482, 485 (7th Cir.1993) (discussing factors necessary for the granting of injunctive relief). Accordingly, the court grants the defendants' motion to strike the plaintiffs' request for equitable relief based on their individual claims without

---

**8.** Although the magistrate judge did not consider these issues, a reviewing court may affirm a lower court on any basis supported in the record. *Casteel v. Pieschek*, 3 F.3d 1050, 1052 (7th Cir. 1993); *U.S. v. Wilson*, 2 F.3d 226, 230 (7th Cir.1993).

**9.** The court notes that its prior order was dated February 9, 1996, but was entered on February 13, 1996.

prejudice. The plaintiffs may renew this request if warranted by further proceedings with respect to the claims which survive the defendants' motion for partial summary judgment.

## 2. Injunctive Relief on Behalf of the Putative Class

To the extent that the plaintiffs seek injunctive relief on behalf of the putative class, the absence of an order certifying a class dooms any such request. *See McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir.1997) ("[b]ecause a class has not been certified, the only interests at stake are those of the named plaintiffs"). In other words, as recently explained by the Seventh Circuit, "a wrong done to plaintiff in the past does not authorize prospective, class-wide relief unless a class has been certified. Why else bother with class actions? '[T]he scope of the injunctive relief . . . is in large part determined by the class action question.'" *Id., citing Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, 1072 (7th Cir.1976).

For the reasons discussed below, the plaintiffs' motion for class certification is denied without prejudice. This ruling means that the defendants' motion to strike the plaintiffs' request for equitable relief with respect to the putative class is granted. The plaintiffs' request for equitable relief with respect to the putative class is stricken, however, without prejudice. As before, the plaintiffs may renew this request if warranted by further proceedings.

## B. Defendants' Motion to Dismiss Plaintiffs' State Law Claims

The plaintiffs' amended complaint includes three supplemental state law claims pursuant to 28 U.S.C. § 1367. Specifically, the plaintiffs claim that the defendants: (1) subjected them to unlawful searches and seizures in violation of Article I, § 6 of the Illinois Constitution; (2) violated their equal protection rights under Article I, § 2 of the Illinois Constitution; and (3) are liable for false imprisonment. The magistrate judge concluded that federal jurisdiction over these claims was proper and rejected the defendants' argument that the Illinois Court of Claims had

to adjudicate them. The defendants object, contending that the Illinois Court of Claims has exclusive jurisdiction.

In resolving this question, the court is bound by state rules of immunity. *Magdziak v. Byrd*, 96 F.3d 1045, 1049 (7th Cir.1996). Under Illinois law, and specifically, the Court of Claims Act, the Illinois Court of Claims has "exclusive jurisdiction to hear and determine . . . [a]ll claims against the State for damages in cases sounding in tort, if a like cause of action would lie against a private person or corporation in a civil suit . . . ." 705 ILCS § 505/8(d).

According to the defendants, when an Illinois state trooper purportedly violates a state law claim by breaching a duty imposed solely as a virtue of his or her state employment, the Illinois Court of Claims has exclusive jurisdiction. Unsurprisingly, the plaintiffs disagree, contending that actions against state employees in their personal capacities are not suits against the state. They also assert that suits seeking damages for alleged constitutional violations are generally personal capacity suits, citing to *Nelson v. Murphy*, 44 F.3d 497, 505 (7th Cir.1995).

The magistrate judge recommended that the defendants' motion to strike the plaintiffs' state law claim be denied, noting that only certain suits against state employees are suits against the state and thereby fall within the exclusive jurisdiction of the Illinois Court of Claims. Specifically, the magistrate judge cited to the Seventh Circuit's opinion in *Nelson v. Murphy*, 44 F.3d 497, 505 (7th Cir. 1995), noting that: "[suits] against a public employee in his official capacity are suits against the state; suits against the employee in his personal capacity are not suits against the state; and a suit seeking damages for misconduct (in particular, for a violation of the Constitution) usually is a personal-capacity suit." The magistrate judge also noted that it is presumed that a state or its department does not violate the laws or constitution of that state and that, if such a violation does occur, it is solely an action of the servant or the agent of the state, citing to *Westshire Retirement and Healthcare Center v. Department of Public Aid*, 276 Ill.App.3d 514,

520, 213 Ill.Dec. 265, 658 N.E.2d 1286, 1291 (Ill.App.1st Dist.1995).

■ Based on the Illinois Supreme Court's decision in *Currie v. Lao*, 148 Ill.2d 151, 170 Ill.Dec. 297, 592 N.E.2d 977 (Ill. 1992), the Seventh Circuit teaches that questions of sovereign immunity in Illinois depend on the source of the duty that the employee allegedly breached. *Magdziak v. Byrd*, 96 F.3d at 1048. Specifically:

> Where the charged act of negligence arose out of the State employee's breach of a duty that is imposed on him solely by virtue of his State employment, sovereign immunity will bar maintenance of the action in circuit court. Conversely, ... where an employee of the State, although acting within the scope of his employment, is charged with breaching a duty that arose independently of his State employment, a suit against him will not be shielded by sovereign immunity.

*Id., quoting Currie v. Lao*, 148 Ill.2d at 159, 170 Ill.Dec. 297, 592 N.E.2d at 980 (citations omitted).

■ Critically, however, as noted by the magistrate judge, the Seventh Circuit has also held that, under Illinois law, "suits against the employee are not suits against the state; and a suit seeking damages for misconduct (in particular, for a violation of the Constitution) usually is a personal capacity suit." *Nelson v. Murphy*, 44 F.3d 497, (7th Cir.1995) (Easterbrook, J.) (denying petition for rehearing). Moreover, the Court of Claims "does not have exclusive jurisdiction where the plaintiff claims that the state employee acted in violation of statutory or constitutional law, or in excess of his authority." *Id., citing Healy v. Vaupel*, 133 Ill.2d 295, 308, 140 Ill.Dec. 368, 549 N.E.2d 1240, 1247 (Ill.1990).

■ The Illinois Supreme Court has adopted a three-prong test to determine whether an action is against the State (and thus is within the exclusive jurisdiction of the Illinois Court of Claims). *Healy v. Vaupel*, 133 Ill.2d at 309, 140 Ill.Dec. 368, 549 N.E.2d at 1247. Specifically, an action is against the State if: (1) the plaintiff does not claim that the State's agent or employee acted beyond the scope of his authority; (2) the duty allegedly breached was not owed to the public generally independent of the fact of State employment; and (3) the alleged actions involved matters ordinarily within the agent or employee's normal and official State functions. *Id.* Alternatively, an action is also deemed to be an action against the State if judgment in the plaintiff's favor could control the actions of the State or subject it to liability. *Nichol v. Stass*, 297 Ill.App.3d 557, 560, 232 Ill.Dec. 16, 697 N.E.2d 758, 760 (Ill.App.1st Dist.1998). As noted above, however, "[s]overeign immunity affords no protection ... when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority ..." *Healy v. Vaupel*, 133 Ill.2d at 308, 140 Ill. Dec. 368, 549 N.E.2d at 1247.

The Illinois Supreme Court's "look to the source of the duty" test in *Currie* and its three-prong test in *Healy* are, obviously, different tests. Moreover, the Seventh Circuit's decision in *Nelson* (which follows *Healy* ) and its decision approximately one year later in *Magdziak* (which follows *Currie*, without discussing *Healy* or *Nelson* ) do not shed appreciable light on these two apparently divergent approaches to the sovereign immunity issue. The court believes, however, that *Currie* and *Healy* can be harmonized by construing *Currie* 's "look to the source of the duty" test as an amplification of the second prong of *Healy*, which directs the court to consider whether the duty allegedly breached by the defendant was owed to the public generally. *See Nichol v. Stass*, 297 Ill.App.3d at 566–67, 232 Ill.Dec. 16, 697 N.E.2d at 764.

■ With this background in mind, the court turns to its consideration of the parties' arguments regarding sovereign immunity and the *Healy* factors. Neither party has focused on the dispositive point with respect to sovereign immunity, which is that, according to the Illinois Supreme Court, the Court of Claims does not have exclusive jurisdiction if the plaintiff asserts that the state employee acted in violation of statutory or constitutional law. *See Healy v. Vaupel*, 133 Ill.2d at 308, 140 Ill.Dec. 368, 549 N.E.2d at 1247. Thus, the defendants' arguments regarding *Magdz-*

*iak* (which follows the "look to the source of duty" test in *Currie* ), the source of the state troopers' duties towards the plaintiffs and Illinois drivers generally, and the remaining *Healy* factors are irrelevant. For these reasons, the court agrees with the magistrate judge that federal jurisdiction over the plaintiffs' state law claims is proper and overrules the defendants' objections to the corresponding portion of the R & R addressing that issue.

### IV. Plaintiffs' Objections to the Denial of Their Motion to Modify a Discovery Subpoena

The plaintiffs object to the magistrate judge's order denying their motion for leave to modify a discovery subpoena. The plaintiffs served a subpoena duces tecum on the Illinois Secretary of State seeking information regarding licensed Illinois drivers. The plaintiffs now wish to modify the subpoena by seeking each driver's social security number. The plaintiffs argue that the social security numbers will buttress their statistical evidence. Specifically, according to the plaintiffs, the social security numbers will allow them to secure the race of persons who have received warnings or citations and thus allow them to compile a more complete database of persons stopped by the Illinois state police.

The magistrate judge denied plaintiff's motion without prejudice, stressing: (1) the uncertainty of the relevance and utility of the requested information; and (2) the privacy concerns implicated by the plaintiffs' request. The magistrate judge nevertheless gave the plaintiffs leave to refile their motion "so that you can show me that there might be some nexus in analyzing the information when having the Social Security information." *See* Aug. 8, 1997 Transcript of Proceedings Before the Hon. Edward Bobrick, at 22. The plaintiffs elected to object to the magistrate judge's ruling rather than refile their motion.

Magistrate judges' orders on nondispositive matters are governed by Federal Rule of Civil Procedure 72(a), which provides that a district court may only modify or set aside any portion of a magistrate judge's order if the order is clearly erroneous. Fed.R.Civ.P. 72(a). As discussed above, statistical evidence by itself is insufficient to show that similarly situated persons of different races are treated differently. This means that, to determine whether the magistrate judge's decision was clearly erroneous, the court must consider whether the additional information sought by the plaintiffs would bring them any closer to meeting the *Armstrong* standard.

Unfortunately for the plaintiffs, the answer to this question is "no." The Illinois State Police Field Reports, which indicate race, were insufficient to stave off summary judgment on the plaintiffs' equal protection claims. The social security numbers may well provide a more complete picture than the field reports. Nevertheless, the court finds that they would not affect the disposition of the plaintiffs' equal protection claims because the information they allegedly would provide is functionally identical to the information the plaintiffs already possess. In other words, even if the plaintiffs are correct and the social security numbers would improve the quality of the statistical data, the Achilles' heel of the plaintiffs' equal protection claim—the fact that statistics do not satisfy the "similarly situated" requirement—nevertheless remains. The existence of this Achilles heel renders the plaintiffs' arguments regarding the social security numbers moot. Accordingly, the court overrules the plaintiffs' objections to the magistrate judge's ruling regarding their request for modification of the discovery subpoena.

### V. Plaintiffs' Objections Regarding Their Motion to Compel Subpoenas Directed to the Office of the Secretary of State

The plaintiffs sought information from the Office of the Secretary of State. In light of the court's ruling with respect to the plaintiffs' equal protection claims, it is unclear whether the dispute regarding the information from the Secretary of State is moot. The plaintiffs' objections are, therefore, overruled without prejudice to renewal by no later than 10 days after the date of this order.

## VI. Plaintiffs' Objections to the Denial of Their Motion to Certify a Plaintiff Class

The magistrate judge denied, without prejudice, plaintiffs' motion for class certification, stating that the motion was moot in light of his recommendation with respect to the defendants' motion for partial summary judgment. The magistrate judge premised this decision on the fact that the recommendation fundamentally changed the facts supporting the plaintiffs' request for class certification. The plaintiffs object, arguing that: (1) the order denying the motion for class certification exceeded the scope of the magistrate judge's authority; (2) their request for class certification is not moot: and (3) a decision as to whether to certify a class should not be contingent on the issuance of an order finding that the plaintiffs are entitled to prevail on their claims.

As suggested by the plaintiffs, the court construes the magistrate judge's order as a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(A) (magistrate judges may not hear and determine motions "to dismiss or permit maintenance of a class action"). For the following reasons, the court overrules the plaintiffs' objections to this R & R as it agrees with the magistrate judge's conclusions regarding the viability of the motion for class certification.

Specifically, it would be wholly illogical to consider the motion as it presently stands in light of the fact that many of the plaintiffs' claims—including their equal protection claim, which plays the starring role in the plaintiffs' motion for class certification—are no longer viable. In this regard, it is important to note that the plaintiffs seek to certify a class of persons who have been subjected to defendants' alleged practice of stopping, detaining and also often searching motorists on the basis of race. *See* Plaintiffs' Substituted Motion for Certification of Plaintiff Class at 1. In other words, the plaintiffs' motion appears to be premised on their now defunct equal protection claim.

A decision that the named plaintiffs' claims lack merit may disqualify them as proper class representatives, thereby mooting the class certification question. *Cowen v. Bank United of Texas,* 70 F.3d 937, 941 (7th Cir.1995). Based on the plaintiffs' objections, however, it is unclear whether their motion for class certification rests entirely upon their equal protection claim. The court declines to comb the motion for class certification and the record to amend the motion based on subsequent developments. Instead, the court adheres to its decision denying the motion without prejudice. This means that the plaintiffs may renew their motion if they elect to pursue certification based on the claims which survive summary judgment.

The plaintiffs' objections to this course of action are unconvincing. First, the magistrate judge did not, despite the plaintiffs' arguments to the contrary, reach the merits and conclude that the motion was moot. Instead, he found that his recommendation with respect to the defendants' motion for partial summary judgment "render[ed] the allegations in plaintiffs' motion (and supporting brief) somewhat stale, if not in need of significant amendment." *Chavez v. Illinois State Police,* 94 C 5307 (N.D.Ill. Sept. 25, 1997) (Bobrick, M.J.). For the reasons stated above, this court agrees with this conclusion and stresses that its decision regarding the motion for class certification should not be construed as expressing any opinion with respect to the merits (or lack thereof) of the plaintiffs' request for class certification.

Second, the plaintiffs' contention that they are entitled to a ruling on their motion for class certification before the court considers the defendants' motion for partial summary judgment is simply incorrect. According to Rule 23, a decision regarding such a motion must come "as soon as practicable" and does not depend on the outcome of the suit. Fed.R.Civ.P. 23(c); *Bieneman v. City of Chicago,* 838 F.2d 962, 964 (7th Cir.1988). Failure to follow this "preferred procedure does not necessarily amount to reversible error." *Mira v. Nuclear Measurements Corp.,* 107 F.3d 466, 475 (7th Cir.1997).

Instead, the Seventh Circuit has held that the "as soon as practicable" standard in Rule 23 "allows for wiggle room" as "[o]ne way to try to knock [a class action] off at low cost is

to seek summary judgment before the suit is certified as a class action." *Cowen v. Bank United of Texas.*, 70 F.3d at 941. Thus, courts have held that, if a plaintiff's claims are without merit, summary judgment may properly precede a ruling on the motion for class certification. *Allen v. Aronson Furniture Co.*, 971 F.Supp. 1259, 1261 (N.D.Ill. 1997), *citing Marx v. Centran Corp.*, 747 F.2d 1536, 1552 (6th Cir.1984); *Jenkins v. Heintz*, 124 F.3d 824, 827 n. 2 (7th Cir.1997) (noting without comment that the district court had denied the plaintiff's motion for class certification without prejudice and opted to resolve the substantive issues first).

The court acknowledges that an accelerated merits disposition may be preferable when the court considers the merits before ruling on a motion for class certification. In this case, however, the delay in doing so is largely attributable to the plaintiffs. Moreover, the plaintiffs do not appear to be contending that consideration of at least a portion of the merits prior to consideration of their motion for class certification was prejudicial. For these reasons, the plaintiffs' objections to the magistrate judge's recommendation regarding their motion for class certification are overruled and that motion is denied without prejudice.

## VII. Conclusion

The defendants' motion for partial summary judgment (# 150–1) is granted in part and denied in part. Specifically, the defendants are entitled to summary judgment with respect to: (1) plaintiff Peso Chavez and plaintiff Gregory Lee's equal protection claims; (2) all plaintiffs' freedom of movement claims; (3) the claims against defendants Kenneth Hall, Lonnie Inlow, Kathleen Sauter and Michael Snyders; (4) Chavez' Fourth Amendment stop and search claims against Gillette and Cessna; and (5) Chavez' Fourth Amendment stop claim against Graham. The defendants' motion for summary judgment with respect to Chavez' Fourth Amendment search claim against Graham and the claims of plaintiff Joseph Gomez is denied.

The following objections to additional reports and recommendations are overruled: (1) the plaintiffs' objections regarding their motion to strike certain paragraphs of the defendants' Local Rule 12(m) statements (# 188–1); (2) the plaintiffs' objections regarding their motion to modify discovery subpoena (# 310); (3) the plaintiffs' objections regarding their motion to file affidavits in opposition to the defendants' motion to strike and dismiss their claims for equitable relief and supplemental state law claims (# 230); (4) the plaintiffs' (# 305) and defendants' (# 307) objections regarding the defendants' motion to strike and dismiss the plaintiffs' claims for equitable relief and supplemental state law claims; (5) the plaintiffs' objections regarding their motion to certify a plaintiff class (# 324); and (6) the defendants' objections regarding the March 16, 1998 report and recommendation addressing Gregory Lee (# 345). The plaintiffs' objections regarding their motion to compel enforcement of subpoenas directed to the Office of the Secretary of State (# 216) are overruled without prejudice to renewal by no later than 10 days after the date of this order.

Finally, the court denies the plaintiffs' motion to continue the stay with respect to the defendants' summary judgment motion (# 347–1), the plaintiffs' motion to stay additional pending matters (# 355–1), and the plaintiffs' motion to withdraw and substitute the declaration of Martin Shapiro and associated filings (# 367–1 and # 367–2).

Magistrate Judge Bobrick recently set an expert discovery cutoff date of November 13, 1998. Fact discovery has already closed. The parties are ordered to file a final pretrial order by December 14, 1998. All motions in limine must be filed by November 30, 1998. The court will not entertain any motions in limine filed after this date. Responses must be filed by December 7, 1998, and replies must be filed by December 14, 1998. The court will conduct a pretrial conference on December 21, 1998 at 3:00. Trial shall commence on January 25, 1999.